The State ex rel. Wood v. Smith.

'THE STATE, *ex rel.* WOOD, Attorney General, v. SMITH *et al.*

### In Banc, February 14, 1893.

1. **Statute, Construction of.** A law, criminal in part, will be strictly construed.

2. **Grain Inspection:** PUBLIC WAREHOUSES: STATUTE.   The inspection of grain by state inspectors, under the act of the legislature of June 22, 1889 (Laws, p. 124), is limited to grain in public warehouses.

3. ———: PRIVATE INSPECTION: STATUTE.   The statute does not inhibit private inspection in a city of the state in which no public warehouse is situated, though such city has been made an inspection district and assistant inspectors are located there to inspect grain, as contemplated by the law.

4. ———: PUBLIC WAREHOUSES: STATUTE.   Such public warehouses embrace only those of a capacity of fifty thousand bushels, and then only when the grain is stored in bulk and the grain of different owners is mixed together, or where the grain is stored in such a manner that the identity of the different lots cannot be accurately preserved.

5. ———: ———: ———.   Such public warehouses do not include those in, which the owners store their own property or those in which they lease to others bins in which the latter may store their own grain and preserve it separate and distinct from grain belonging to other owners.

6. ———: ———: ———.   The fact that the lessees of such bins in some instances had the elevator owners mix different lots and grades of grain together, or themselves mixed two loads of the same grade belonging to the same owner, does not make such elevators public warehouses, where the elevators did so in no case on their own account.

7. ———: ———. Even though there were public warehouses in such city, that fact would not abolish the right of private inspection in other warehouses by inspectors provided by their owners.

8. ———: ———. Such warehouses will not be deemed public warehouses because of the magnitude of the grain business done therein in such city.

## Quo Warranto.

WRIT DENIED.

*McDougal & Sebree* for relator.

(1) The assistant inspectors of grain at Kansas City were appointed, qualified and performed duties under and pursuant to law (Revised Statutes, 1889, secs. 5636–5644). Their duties concerned the public, hence they were public officers. *People v. Hays*, 7 How. Pr. (N. Y.) 248; *Wood's Case*, 2 Cow. (N. Y.) 29, note; *Bradford v. Justice*, 33 Ga. 332. (2) And in usurping their offices and assuming to act as inspectors of grain, the respondents Walker and Wagoner were guilty of a misdemeanor. Revised Statutes, 1889, sec. 5643; *Dutcher v. People*, 11 Bradw. (Ill. App. Ct.) 312; *East St. Louis, etc., v. People*, 105 Ill. 382. (3) The warehouses and elevators in proof are "public warehouses" within the meaning of the law. Revised Statutes, 1889, art. 3, ch. 87, sec. 5607. (4) It does not matter that these warehouses are owned and operated by private individuals who buy and sell in other states as well as in this, for the business is carried on exclusively in this state and concerns the public, and the state has the right to prescribe these regulations. *Munn v. Illinois*, 94 U. S. 113. (5) The state has the right, under the Federal constitution, to make and enforce the act in question as an "inspection law" under the police power reserved to the state. *Turner v. Maryland*, 107 U. S. 38; Tiedeman on Limitations of

Police Powers, sec. 89, and cases cited; *Clintsman v. Northop*, 8 Cow. (N. Y.) 45–6; 11 American & English Encyclopedia of Law, 234, and cases cited, note 11. (6) And the legislature is the sole judge of the necessity for and expediency of laws of this class. *Tyler v. People*, 8 Mich. 320; *Georgia v. Stanton*, 6 Wall. 50; *People v. Draper*, 15 N. Y. 532; *Sharpless v. Mayor*, 21 Pa. 147; *Bennett v. Boggs*, 1 Bald. 74; *Hamilton v. St. Louis*, 15 Mo. 23. (7) The presumption is that the state has the right to enact and enforce this law under the constitution. *Humes v. Railroad*, 82 Mo. 222; *State v. Hope*, 100 Mo. 347. (8) Under a similar state constitution, and long before we adopted it, this same law was held to be constitutional by the court of last resort of the state whence we borrowed it and by the supreme court of the United States. *Munn v. People*, 69 Ill. 80; *Munn v. Illinois*, 94 U. S. 113; *People v. Harper*, 91 Ill. 357. (9) And the presumption is that Missouri adopted the construction thus put upon this law, and by that construction the court should be bound. 3 American & English Encyclopedia of Law, 681, and citations under note 2; *Skouten v. Wood*, 57 Mo. 380.

*Karnes, Holmes & Krauthoff* for defendants.

GANTT, J.—This is a proceeding by "*quo warranto*," instituted in division number one of this court, and by that division referred to the court in banc and argued at this term.

The information charges that the defendants, Walker and Wagoner, by virtue of an appointment and employment by the commercial exchange of Kansas City have usurped and intruded into the offices of assistant inspectors of grain at Kansas City, and the privileges, franchises and emoluments thereof, and claim the right so to do, to the damage and prejudice

of the authority of the state. " That there is shipped daily to said city, and there sold and bought and shipped from said city, by citizens of this and other states who are not members of the said commercial exchange, nor in any way connected therewith, large quantities of grain, amounting annually to many millions of bushels, thereby making said city one of the chief grain markets of the country, and that all or nearly all of the grain shipped to or from said city is received, bought, sold, stored, shipped or in some way handled and controlled while there by the members of said commercial exchange.

"That the grade of such grain and the dealings and bargains of said grain-dealers of Kansas City with persons shipping to, and selling, or buying grain on said market, are based upon a certificate of inspection issued by an inspector of grain in said city and the grade of such grain determines and fixes its price and value, so that it is of great public importance that the inspection of grain in said city should be conducted by impartial inspectors appointed under, and as provided by law.

"That in the month of November, 1889, there were at said Kansas City, and yet are *public warehouses* for the reception, storage and handling of grain, and the board of railroad and warehouse commissioners of the state of Missouri, being cognizant of that fact, and recognizing the importance of Kansas City as a grain market, and the interest of the public in having proper and fair inspection of grain there, by authority of law declared said Kansas City a grain inspection district, and established a proper number and standard of grades for the inspection of grain, and established and have ever since maintained, and do now maintain an inspection office in said city, and duly appointed assistant inspectors of grain for said inspection district,

and have at all time since kept, and do now keep, at said city duly appointed, qualified assistant inspectors of grain in said city, viz., John Martin and John W. Harmon, who are public officers for the purpose of inspecting grain that may be received into or shipped out of said city.

"That on or about the twenty-eighth day of July, 1890, said board of railroad and warehouse commissioners made and adopted revised rules for the inspection of grain in said state and city, a copy of which is herewith filed and made part hereof, and required the collection of a reasonable charge for the inspection of grain as provided by law.

"That it was the sole prerogative of the inspectors appointed by said board to inspect all grain received into or shipped from the public warehouses of said city and *also all other grain in said city which the owners or those in control of the same desire shall be inspected, and to receive a certificate of its grade.* That the commercial exchange on or about the eighth of February, 1892, without authority of law, did appoint the respondents, Walker and Wagoner, inspectors of grain at said city and empowered them to sign certificates of inspection, and fixed the charges for weighing, sampling and inspection in the aggregate at sixty cents per car. That by virtue of this appointment Walker and Wagoner are inspecting grain in said city and receiving the fees therefor, and the said exchange and its members deny the right of the inspectors appointed by the board of railroad and warehouse commissioners to inspect grain in said city."

The respondents waived the issuance of the writ and made return to the information. They admit the incorporation of the exchange, the appointment of its own inspectors, "and defendants say that while the process of fixing the grade of grain is sometimes called

inspection, and the person engaged in determing the matter, an inspector, yet in truth and in fact there is no inspection in the sense in which the word is used in legal parlance, nor for the purpose of determining any matter cognizable under the police power of the state, as applicable to the facts and mode of business hereinafter mentioned.

"The defendants say that it is not true that there were at said Kansas City, at the time of filing the information herein, nor for a long time prior thereto, any public warehouses for the reception, storage or handling of grain, nor are there any such public warehouses at said city at this time. The defendants say that it is true that about the month of November, 1889, the board of railroad and warehouse commissioners of the state of Missouri placed at said city a number of its appointees, called assistant inspectors, to determine the grades of grain bought and sold at said city, but the defendants deny that it was or is or ever has been the duty of the persons so appointed by said board of commissioners to inspect all grain in said city which the owners or those in control thereof desired to have inspected, or concerning which they desired to receive a certificate showing the grade thereof. On the contrary defendants aver that when there ceased to be in said city any public warehouse the said board had no longer any authority to appoint or continue any person to act as its employe or appointee at said city for the inspection of grain, and they especially deny that said board ever had power or authority to require any person, not the keeper of a public warehouse, desiring to have the grade of grain determined, to resort alone to the services of said alleged appointees. That in November, 1889, there was at said Kansas City only one public warehouse for the storage of grain, known as the Inter-Ocean Ele-

vator, the owners of which qualified as public ware-housemen in accordance with the provisions of the statute in such cases made and provided June 22, 1889; that the existence and qualification of said Inter-Ocean Elevator was embraced by said state board of railroad and warehouse commissioners as furnishing authority to place assistant inspectors at Kansas City aforesaid; that the license of said Inter-Ocean Elevator expired in the month of May, 1890, and was not renewed, and that since said date there has not been a public warehouse, either licensed or unlicensed at said city.

"Defendants charge that the insufficient inspection of the board's inspectors was the cause of the exchange appointing its own inspectors; that the said Walker and Wagoner are in every respect competent and qualified to act, and are experts well known to the business world, in whose judgment, abilities and integrity there is universal confidence, and the defendants say that although the said Walker and Wagoner have acted for less that two months, Kansas City grades are rapidly reestablishing their former high repute in the markets of the world, and the results to the business of Kansas City have been gratifying in the extreme; that at no time has there been imposed the slightest obligation on any person to employ said exchange's appointees or to be bound by their actions, but that such employment is purely voluntary, and a matter of private agreement between persons *sui juris* relative to a legitimate business transaction concerning no one but themselves, and in nowise affected with a public interest.

"The said Walker and Wagoner accepted said employment and are performing labor for such persons who may choose to employ them, whether members of said commercial exchange or not, and without in the

least wise interfering with the doing of similar labor by others, whether appointees of said state board or any other person they may agree upon as mutually satisfactory.

"The defendants further say that the charges fixed by said state board were and are forty cents per car for inspection, while said commercial exchange only charges twenty-five cents per car for the same labor. The defendants also state that the aggregate of the fees charged by said assistant inspectors were greatly in excess of the actual cost of performing their services and constituted an unnecessary burden and tax upon commerce, both local and inter-state; that the excess collected above the actual cost of such services was diverted to uses and purposes entirely unconnected with and foreign to the matter of determining the grades of grain bought and sold at Kansas City to the amount and extent of over $600 per month.

"The defendants further aver that nearly all of the grain at said Kansas City is either sold to merchants owning or controlling elevators, who become the purchasers and owners of grain long before the same is placed in their respective elevators, or by commission merchants who sell grain as factors for others and without storing the same, so that the grain of different owners is mixed together, or in such a manner that the identity of different lots cannot be accurately preserved; that the mode of doing business at said Kansas City, as aforesaid, has been adopted because the peculiar qualities and conditions of grain raised in and sent to said market from the state of Kansas make it absolutely necessary to do so, and render it impossible to operate a public warehouse at said city.

"Except as herein expressly admitted, the defendants deny generally each and every allegation in the relator's information contained.

"The defendants say that great quantities of grain are bought and sold at other points in the state of Missouri according to the grades thereof ascertained by so-called inspection, by and to persons owning elevators or engaged in business as merchants and factors, and that at such points persons are engaged in earning a livelihood as experts in determining the grades of grain, and that no effort has been or is being made to interfere with the exercise of such rightful callings at any other point than at Kansas City, nor with such exercise by any other person than by those engaged in business at said city. And the defendants further state that many persons in said state are engaged in buying and selling articles of merchandise other than grain by a similar system of so-called inspection had for the same purpose as in the case of grain, in which dealings the public has the same interest as in the matter of the dealings of these defendants, and that as to such other persons and commodities no interference has been attempted, or is being asserted, nor any such burdens placed as those undertaken to be enforced against and placed upon those engaged in selling and buying grain at said Kansas City, thus and thereby discriminating against said last mentioned persons and the lawful vocation which they are pursuing.

"So that these defendants say that any construction of the act approved June 22, 1889, relied on by the relator herein, which will deny to these defendants the right to exercise a legitimate calling, private in its character, in a lawful manner at said Kansas City, as hereinbefore set out, and especially when exercised by them in the same manner as others doing the same business in a similar manner at other places in said state, will not only be violative of the fundamental and inalienable rights of those defendants as American citizens, but will also make said enactment contrary to the fol-

lowing provisions among others of the constitutions of the state of Missouri, and of the United States respectively, to-wit:

"I. Section 4 of article 2 of the constitution of the state of Missouri: 'That all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry.'

"II. Section 30 of article 2 of said constitution: 'That no person shall be deprived of life, liberty or property without due process of law.'

"III. Section 8, article 1 of the constitution of the United States, that 'The Congress shall have power: * * * To regulate commerce * * * among the several states.'

"IV. The fourteenth amendment to the constitution of the United States, that 'no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.'"

The reply is a general denial of new matter.

The evidence was taken by depositions. From this evidence it appears that prior to 1889, grain was inspected at Kansas City under the supervision of the Kansas City Board of Trade. In 1889, the Board of Railroad and Warehouse Commissioners placed inspectors at said city. It appears that only one of the elevators "the Inter-Ocean" ever took out a license as a public warehouse, and when its license expired did not renew it.

It is established, indeed hardly controverted, that the method of transacting the grain business at Kansas City in all save one of the warehouses having a capacity of fifty thousand bushels, is that no grain is stored in

these warehouses except that which belongs to the owner thereof before it enters the building. The evidence disclosed that a very small per cent. of grain belonging to others than the proprietors has been stored in these warehouses for the purpose of obtaining a better market, but when sold is bought by the proprietor of the warehouse, who had made advances upon the consignment and had a lien thereon. The Empire Elevator is one exception to this rule. The mode of doing business at that elevator is to rent to an applicant, upon terms to be agreed on between the parties, one or more special bins into which the grain of the renting party is placed in storage. In this elevator there is no mixing of the grain of different owners. It does appear that in one case the same commission merchant represented three different customers, and, *by their mutual consent*, he placed their wheat in one bin. This however was the only case shown. No warehouse receipts are issued, and the identity of each man's grain is carefully preserved.

Respondents offered much evidence as to the competency of the state inspectors, and to the effect that the grade adopted by the state grain inspector was not reasonable and was not adapted to the grain received and sold at Kansas City. The evidence tended to show that at least ninety-five per cent. of the grain came from Kansas and Nebraska. That it was a hard wheat, small in grain and dark in color. While exceedingly nutritious it would not make a high grade of flour. It had established a grade known as "Kansas hard." It found a market in the eastern states and in Europe.

Respondents also offered much evidence tending to show that mixing wheat was a necessity of this market, and consequently the law forbidding it should be done in a public warehouse practically rendered it impossible to maintain a public warehouse in said city. The

evidence further tended to show that *Kansas City was not in any sense a speculative grain market.* That although it had become one of the great grain markets of the world, it was so in the actual receipts and sales and shipments of grain, not in storing large quantities in great elevators, and dealing in futures based on these deposits.

I. This action is predicated upon an act of the general assembly of this state approved June 22, 1889, and entitled "An act to increase the duties of the board of railroad commissioners, changing. the name of said board, providing for the organization of *public warehouses*, and to regulate the warehousing and inspection of grain in public warehouses in the state of Missouri." By this act this board was authorized to appoint a chief inspector of grain for this state who should have the general supervision of the inspection of grain as required by the laws of this state. By section 3 it is provided, "*Public warehouses* shall embrace all warehouses, elevators and granaries in which is stored *grain in bulk and in which the grain of different owners is mixed together*, or in which grain is stored *in such a manner that the identity of different lots cannot be accurately preserved; provided*, that no warehouse, elevator or granary with a capacity less than fifty thousand bushels measurement shall be considered a public warehouse." The law further provides for licensing the operator of a *public warehouse*, requiring a bond in proportion to the capacity of his building conditioned for the faithful performance of his duties as such, and as surety for any penalties he might incur by a violation of the laws. Another section made it a misdemeanor to transact business as a public warehouseman without first obtaining license and giving the bond required. The chief inspector was empowered to appoint deputy and assistant inspectors. Section 7 made it "the duty of

the person or persons doing a public warehouse business under this act to receive for storage any grain that may be tendered to him or them in the usual manner with which warehouses are accustomed to receive the same in the ordinary and usual course of business, and not to discriminate between persons desiring to avail themselves of warehouse facilities," and required all charges to be "uniform, regardless of quantities of lots so offered or received."

Under this law the board of railroad and warehouse commissioners established an inspection station at Kansas City in November, 1889, and appointed assistant inspectors for said city. From that time until the eighth of February, 1892, all of the inspection of grain there was done by the state inspectors, for which a charge was made, but on that day "the commercial exchange" there, of which respondents, except Walker and Wagoner, are the officers and board of directors, appointed respondents Walker and Wagoner grain inspectors for Kansas City, and all of the grain men belonging to said exchange, which includes about all the grain men in said city, notified the state inspection department that they did not desire the state inspectors to do any more inspection, and since that time the said Walker and Wagoner have, under the orders of said exchange, done practically all of the inspection of grain that has been done in said city, though the state inspectors still remain there ready to do inspecting. Said "commercial exchange" charges and collects compensation from the owners of wheat for inspecting the same by said Walker and Wagoner.

It is *this conflict over the emoluments* pertaining to the inspection of grain that gave rise to this proceeding.

It is to be observed in the outset that the general assembly, by this act of June 22, 1889, intended to regulate only *"public warehouses."* The act nowhere

specifically defines what shall constitute *a public warehouse,* but leaves us by a process of exclusion and inclusion to ascertain the subject-matter of the law. All warehouses with a capacity less than fifty thousand bushels measurement are declared *not* to be public warehouses, whatever may be their mode of transacting business. The statute provides that "public warehouses shall *embrace* all warehouses, elevators and granaries *in which is stored grain in bulk, and in which the grain of different owners is mixed together,* or in which grain is stored *in such a manner that the identity of different lots cannot be accurately preserved.*"

On the twenty-fifth of April, 1871, the legislature of the state of Illinois passed an act to regulate public warehouses in that state. Our law of 1889 is substantially a transcript of the Illinois law, except as to classification. As to that we have declared *only those warehouses to be public which correspond in all respects with those falling in class "A" under the Illinois statute.* In *Dutcher v. People,* 11 Bradwell's Reports, 312, the appellate court of the fourth district construed this act in a prosecution against Dutcher for unlawfully assuming to act as an inspector of grain at East St. Louis. It was admitted he acted as inspector and the court says: "The only question for solution is whether there was then at that place 'legally appointed inspectors of grain * * *.' If this question can be answered affirmatively, the defendant was liable to conviction. If it must be answered in the negative, there was no offense." In other words the court held, that, until a lawful public inspection was inaugurated, private inspection was lawful.

So here it would seem clear that until it can be shown that the respondents have usurped the right to inspect grain under the circumstances and *in a place*

which the law has declared shall only be done by an inspector appointed by the board of railroad and warehouse commissioners, they are not guilty. This is a criminal law in part and must be construed strictly. For many years associations of merchants have appointed and employed experts to inspect grain. It was done to facilitate trade. When honestly done there can be no objection to it. In that way each producer receives the true value of his products. No question as to the lawfulness of this inspection was ever made. It was a matter of legitimate contract. When the legislature concluded to regulate inspection by public officials, in its wisdom it saw fit to interfere with the long established practice of the exchanges and boards of trade *in a certain class of warehouses only.*

The contention of relator, that this law should be construed so that, if it shall appear there is only one public warehouse in Kansas City, the existence of that one would abolish the right of private inspection in every other warehouse and place in said city, is untenable and is a construction against common right, and is not supported by the statute. The statute is in derogation of a right and custom long exercised, and the inspection it provides is confined in every section, and in almost every line to grain in "public warehouses." The statute *ex vi termini* limits the inspectors it creates to a definite field of labor and to certain grain. *It nowhere* says that they are authorized to inspect *all grain* received and stored in any city *where a public warehouse is situated.* On the contrary sections 8 and 9 limit their inspection to *receipts* and *deliveries of grain by and from public warehouses,* and so does the title of the act. *Dart v. Bagley,* 110 Mo. 42; *Koelle v. Knecht,* 99 Ill. 396.

Unlike Illinois, Missouri has not essayed to declare "all elevators or storehouses where grain or other prop-

erty is stored for a compensation, whether the property stored be kept separate or not, to be public warehouses.'' Missouri has left to her citizens the inherent right of contract, subject only to proper inspection laws when the *public interest* required it. Reading the statute itself we glean from it that the legislature had in mind those great elevators in which it was found impossible to preserve each owner's grain separate, hence the importance to him of having an honest inspection *when his grain went in and an equally honest inspection when it came out.* The opportunity to mix inferior and unsound grain with the superior and high grade grain suggested to the legislature the damages that might accrue to producers and shippers from a dishonest or insufficient inspection in these great storehouses. Not so, however, in those of small capacity— and where grain of different owners was never mixed. This is clear from the fact that no warehouse is declared public but those of a capacity of fifty thousand bushels, and then only if the grain is *"stored in bulk and the grain of different owners mixed together,"* or in which the grain is stored "in such a manner that the identity of different lots cannot be accurately preserved."

A proper construction of the expression "stored in bulk and the grain of different owners mixed together" requires they should be read in conjunction as they appear in the act. The language is used in contradistinction to storage of each owner's grain *in kind* and without *mixing with another's.* In the large public elevators which invite the public to store with them, the grain goes into a common bulk, and after that the right of its owner is represented by a warehouse receipt certifying to the amount thereof and its grade, and it is the regulation of such a warehouse to which the statute refers when it uses the language "stored in bulk and the grain of different owners mixed together."

But the language of the act forbids the construction that the legislature had in mind those warehouses in which the owners thereof stored their own property, or in which they leased to other persons certain bins therein in which they might store their grain and preserve it separate and distinct from others. In such a case no warehouse receipt is issued. When the grain is sold, the grain itself is delivered. It is not transferred by the assignment of negotiable warehouse receipts, which call for an equal amount of grain of the same grade and kind out of the general bulk. When stored in a rented bin, or in kind, the owner gets the commodity itself as distinguished from its value in money, or its equivalent in other grain of the kind and grade his was inspected and certified to be.

As before stated, the evidence in this case shows that, with two exceptions, every warehouse and elevator in Kansas City which had a capacity of over fifty thousand bushels refused to store grain for the public, and the proprietors thereof only stored their own grain. If they stored it in bulk it was their own business, and it was no concern of the public. They could sell it *with or without inspection under such circumstances*. The grain of different owners could not be mixed in these warehouses, and the statute had no application to them, and it is clear the state inspectors had no prerogative to inspect it without being requested so to do.

Considering the other two warehouses separately, the Union Elevator, under a special arrangement with certain parties, and under a contract of purchase on which its proprietors made advancements, stored a quantity of wheat. "Each man's wheat was kept in a separate bin." "Different lots of wheat received from the same man go into a special bin or grade." That is, if they receive five cars of number 3, it is binned together in a special bin. Different grades

belonging to the same man are put in separate bins. Under these circumstances the owners bore the relation of lienors and conditional purchasers to the wheat. *Bucher v. Commonwealth*, 103 Pa. St. 528. As before said, the Empire Elevator rented its bins to applicants to store grain upon terms agreed upon, and the owners of these several bins have from time to time had the elevator company mix different lots of wheat and different grades together, but in no such instance was the elevator company doing this on its own account. Neither did it issue any warehouse receipts.

It is insisted by the relator that the mixing of two loads of the same grade belonging to the same owner brings the Empire Elevator within the purview of section 3, which denominates a warehouse as public "in which grain is stored in such a manner that the identity of different lots cannot be accurately preserved." Keeping in mind that this act is a substantial transcript of the Illinois act, it is fair to presume the legislature of this state was actuated by the same purpose that prompted the legislature of Illinois. That act upon its face purports to be in pursuance of the constitutional mandate that the constitution of Illinois required the legislature to pass inspection laws "for the protection of producers, shippers and receivers of grain and produce." Hence we are left in doubt as to the purpose of the law. This law was designed to protect the owner of wheat who desired to store it in a public warehouse, where, according to the method of transacting business, the identity of his wheat could not be accurately preserved. It certainly was not intended to apply to a person who rented a bin for his own use and *directed the owner of the warehouse to store two or more loads of grain in the same bin, as was done in the Empire Elevator*. Such a construction is at variance with the other sections of the law. The act must be construed

as a whole. When the statute speaks of different lots we think it refers to lots belonging to different owners.

*Moreover, we hold that the whole section 3 refers most clearly to a public warehouse where the public is invited to come and make use of its storage facilities, and when the grain will become mixed in bulk and its identity cannot be accurately preserved.* This view is strongly sustained by section 7, which forbids discrimination, which is inapplicable to a case where each producer or shipper owns his own bin, and section 8, which provides that in a public warehouse upon request of the owner or consignee his own grain of the same grade may be kept in a bin by itself apart from the general stock. Such a provision could have no application to a warehouse where there was no general stock. The statute also expressly provides that the charges shall be uniform "regardless of quantities of lots so offered or received," clearly showing that the quantity is immaterial so long as the same grades are preserved. We might go through this act section by section and adduce many more reasons from its own terms why a warehouse devoted to storing grain only in pursuance of special contracts for particular bins is not a public warehouse within the meaning of this act, but we forbear because we think it is evident from the discussion already had. The act from its title to its approval emphasizes the intention of the legislature to regulate public warehouses in contradistinction to private warehouses. No other conclusion seems reasonable.

It follows from these premises that there were no public warehouses in Kansas City when the commercial exchange appointed Walker and Wagoner inspectors, and as there were no public warehouses they could not have usurped the duties of any state inspector at said city.

But it is urged that while it may be true there were no warehouses there at the time complained of, in which the grain of different owners was mixed together, nor in which the grain of different owners was stored in such a manner that the identity of the different lots could not be preserved, nor any which had taken out a license as a public warehouse, or which issued warehouse receipts, or attempted to comply with the statute in any other respect, or invited the storage of the public, still, because of the large business done in grain at the several elevators and warehouses they were practically public warehouses and so run and operated. This view is subversive of our ideas of property rights. It may be that if one assumes to operate a public warehouse and charge and collect tolls as such, he might subject himself to proper inspection laws; but it cannot be affirmed in this state that one may not decline to keep or operate his building as a public warehouse, or that he may not rent or lease a portion thereof to another without subjecting himself to the burdens of a public warehouseman. *Woodruff v. Havemeyer*, 106 N. Y. 129. Under our system of government one may pursue an occupation requiring a license and if he finds it unprofitable he may decline to pursue the business when his license expires. If the grain merchants of Kansas City found that under the laws in regard to public warehouses their trade was injured, they had a perfect right to say they would not operate public warehouses and to desist from a course of trade which required inspection, and adopt one which required none or permitted private inspection. Certainly any citizen may decline to engage in a public business in which all the public have a right to require his services without discrimination and confine himself to a private business in which the public have no concern, and so far as the record discloses this is the case of the grain

merchants of Kansas City. The public had no right to demand storage in their private warehouses without their consent.

Inasmuch as in our opinion the defendants have not usurped any prerogative of the state inspector or his assistants, it becomes unnecessary to examine the constitutionality of the act from the various points of attack made by defendants, or the other questions discussed. The writ of ouster is denied. All concur.