THE STATE OF KANSAS, ex rel. JOHN S. DAWSON, as Attorney-general, etc., *Plaintiff*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY et al., *Defendants.*

No. 17,598.

SYLLABUS BY THE COURT.

1. GRAIN INSPECTION—*When Compulsory—When Voluntary— Statute.* The statute expressly requires all grain going into or coming out of a public elevator to be inspected by officers of the state grain department; no such express requirement is made with regard to other grain, and upon a consideration of the entire act inspection thereof is held not to be compulsory, the provisions of the statute with regard thereto being construed as referring to inspection made upon request of the owner.

2. ———— *"Public Elevator" Distinguished.* An elevator in which the grain of different owners is kept entirely separate, but in which the grain of the same owner delivered at different times is mixed together, except where he directs otherwise, is not a public elevator within the meaning of a statute providing "that all elevators or warehouses located in this state in which grain is stored in bulk, and in which the grain of different owners is mixed together, or in which the grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved, and doing business for a compensation, are hereby declared public warehouses."

3. ———— *Same.* The fact that the operator of an elevator reserves the right to mix the grain of different owners has the same effect in determining its public character as though the grain were actually mixed.

Original proceeding in mandamus. Opinion filed June 8, 1912. Writ denied.

*John S. Dawson,* attorney-general, *S. M. Brewster,* special assistant attorney-general, *George R. Allen, L. W. Keplinger, J. W. Dana,* and *C. W. Trickett,* for the plaintiff.

*M. A. Low,* and *Paul E. Walker,* for defendant The Chicago, Rock Island & Pacific Railway Company.

*W. P. Waggener,* and *J. M. Challiss,* for defendant The Missouri Pacific Railway Company and The Kansas City Northwestern Railroad Company.

*William R. Smith,* for defendant The Atchison, Topeka & Santa Fe Railway Company and The Santa Fe Elevator Company.

*R. W. Blair, B. W. Scandrett,* and *C. A. Magaw,* for defendant Union Pacific Railroad Company.

*F. H. Wood,* and *R. R. Vermilion,* for defendant St. Louis & San Francisco Railroad Company.

*Frank Hagerman, Kimbrough Stone,* and *A. L. Berger,* for defendants John I. Glover *et al.*

*Robert Stone,* and *George T. McDermott,* for defendants E. J. Smiley *et al.*

The opinion of the court was delivered by

MASON, J.: The state brings mandamus against a number of railroad companies and the owners and operators of a number of grain elevators, the purpose of which, in a general way, is to require them to conform to the provisions of the statute providing for the inspection of grain. Evidence has been taken before a commissioner, who has made detailed findings of fact and conclusions of law. The case is submitted upon his report and the evidence.

The state asks that each of the railroad companies be required;

1. To furnish to the state grain inspection department daily manifests of all grain arriving in its freight terminal yards in Wyandotte county;

2. To permit the weighmasters and inspectors of

the department to inspect and weigh the grain in cars in such terminal yards;

3. To collect from the proper parties and pay to the department the fees for each inspection and weighing.

And that each of the elevator owners or operators be required:

1. To procure a license to transact business as public warehousemen, giving a bond as such;

2. To make reports to the grain department of the movements of grain in and out of the elevators, and of the issuance and cancellation of warehouse receipts;

3. To permit the weighmasters and inspectors to weigh and inspect all grain moving into or out of the elevators;

4. To pay the fees for such inspection and weighing.

The officers and directors of a voluntary unincorporated association known as the Kansas Grain Dealers' Association, having a membership of three hundred persons, firms and corporations, engaged in buying and selling grain, have intervened and unite with the defendants in contesting the plaintiff's demands.

Questions are raised as to the construction and validity of various parts of the statute. The two principal questions of construction are: Does the statute contemplate a compulsory inspection of any grain except that stored in public elevators? Can any elevator be public in which the grain of each owner is kept entirely separate and distinct from that of all others? The commissioner was of the opinion that the first question should be answered in the negative, the second in the affirmative.

The statute involved is chapter 222 of the Laws of 1907, published as article 1 of chapter 37 (§§ 3327-3363) of the General Statutes of 1909, as amended by chapter 199 of the Laws of 1911. Section 23 of the original act, after making it the duty of public warehousemen, whenever inspection and weighing is estab-

lished, to receive for storage all grain tendered, proceeds: "such grain to be in all cases inspected, weighed and graded by a duly authorized inspector and weigher . . . and all grain delivered from such warehouse shall be inspected and weighed on its delivery by a duly authorized inspector and weigher of grain." The defendants maintain that this provision compels the inspection of all grain that is stored in public elevators, but that the statute nowhere, either expressly or by fair implication, makes inspection of grain compulsory under any other circumstances. The plaintiff contends that the purpose of the language quoted is not to confer authority to inspect grain, but to impose the duty upon the public warehouseman to refuse to receive or deliver it without inspection; that the inspection contemplated by the act is a compulsory inspection, and that the department has full power to enforce it, irrespective of the wishes of the owner of the grain. To decide the issue so made, the entire statute must be considered. Only the more obviously important features can be presented in a summary.

The act is described in its title as one "in relation to the inspection, storing, weighing and grading of grain." The first section reads:

"A department of record for the inspection and weighing of grain is hereby established, to be called 'the state grain inspection department.' Said department shall have full charge of the inspection and weighing of grain at all railroad terminals, public warehouses, or other points within the state wherever the business transacted will, by the fees provided by law, pay the salary of an assistant inspector and weighmaster, or wherever, upon request by parties interested, to the chief inspector, he may establish inspection and arrange that the officer in charge accept as full compensation for his services an amount equal to the whole revenue obtained at such a place."

The governor is required to appoint a chief inspector of grain for the state (§ 2), among whose duties are: to have supervision of the inspection and weighing of

grain "as required by" law; to supervise the handling, inspecting, weighing and storage of grain; to establish rules therefor, and for the management of public warehouses; to keep records of inspecting and weighing done into and out of licensed warehouses; to investigate complaints of fraud or oppression in the grain trade, and correct them as far as able (§ 3). He is authorized to recommend, and the governor is authorized to appoint supervising inspectors and weighmasters wherever there is a public warehouse. These are required to visit the elevators and railroad tracks every day, the former supervising inspection with a view to securing uniformity, the latter supervising all weighmasters, inspecting scales, and the loading and unloading of grain, with a view to securing correct weights on all grain weighed by the department; similar provision is made for the appointment of assistant inspectors and weighmasters (§ 5). Fees for inspection and weighing are fixed (§ 8). The schedule of fees was changed in 1911, the new section including a provision making it a misdemeanor to deny officers of the department access to scales, elevators, warehouses or other places in the performance of their legal duties (Laws 1911, ch. 199, § 1). The charges for inspection and weighing are a lien on the grain; when the grain is in transit they are to be treated as advanced charges and collected and paid by the carrier (§ 9). Fees collected are turned into the state treasury (§ 10), and all expenses of the department are paid out of the fund so created (§ 11). It is a misdemeanor for an officer of the department to be guilty of neglect of duty, or to grade or weigh grain improperly, or to accept reward for a neglect of duty (§ 12). Section 13 reads:

"The inspection or weighing of grain in this state, whether into or out of public warehouses or elevators, or in cars, barges, wagons, or sacks, arriving at or shipped from points where state grain inspection is established, must be performed by such persons as may be duly appointed and qualified according to law,

The State, *ex rel.*, v. Railway Co.

and any person who shall act as inspector or weigher of grain who has not been thus first appointed and qualified shall be guilty of a misdemeanor."

The officers of the department are given "exclusive control" of weighing and inspecting grain at inspection points and their certificates are made conclusive on all parties interested, unless appealed from in the manner provided (§ 14). Nothing in the act is to be construed to prevent any person selling grain by sample, regardless of grade (§ 17). Sections 19 to 35 relate almost wholly to warehouses. If the owner of grain consigned to a public warehouse is dissatisfied with its inspection, or from any cause desires to withhold it from storage, he may have it delivered to him subject only to such charges as have already accrued (§ 32). Provision is made for a "Grain Grading Commission," to be appointed by the governor, to establish grades for all kinds of grain bought or handled in the state (§ 36).

Specific arguments are advanced for the construction contended for by the state, which may be thus summarized: The fact that the statute makes it a misdemeanor to deny an officer of the department access to scales, elevators and other places in the performance of his duties implies that his inspection may be against the wishes of the owner of the grain. If grain were to be inspected only on request of the owner it would be needless to provide a lien for the inspection fee, since in such case it would be paid. The provision that at the points designated no one but an officer shall inspect or weigh grain shows that the will of the legislature and not of the owner was intended to control. The officers could not have "exclusive control" of inspection if they could act only on invitation. They are required to perform various duties aside from inspecting and weighing grain; they are paid only from the fund produced by fees, and no fees are charged for any other services; if they can only weigh and inspect

23—87 KAN.

grain upon request of the owners, the owners have the power to cut off their compensation and compel them to violate their duty or work for nothing. The purpose of the act is to preserve the credit of the state, the chief means employed being the inspection of outgoing grain; the legislature would be unlikely to allow the use of this means to depend upon the wishes of the owners. The reasons for official inspection at terminal markets exist whether the grain goes into storage or not. To require inspection at public elevators, leaving it optional elsewhere, would amount to an unjustifiable discrimination. The fact that the general inspection is not expressly made compulsory should not be deemed controlling; the statute does not in so many words say that the officers must inspect grain when requested, yet no one would doubt that the duty in such case was mandatory. The history of the legislation strengthens the view that in its present form the main purpose of the statute is inspection. Of this phase of the matter it is said in the state's brief:

"It is important to determine whether the present law under which the grain department operates is an inspection law with elevator and warehouse provisions incorporated therein, or a warehouse law with inspection and weighing of grain provided for therein. If the former, then grain inspection and weighing exists state-wide, subject to be placed in actual operation under the provisions of the statute and the chief inspector. If the latter, then only such grain as is in, destined for, or being shipped out of a public elevator or warehouse is subject to inspection."

Upon a consideration of these arguments, and those of the defendants in reply, the court reaches a conclusion, in harmony with the commissioner's, that it was not the purpose of the legislature to make inspection compulsory except as to grain stored in public elevators. There are obvious reasons for requiring an official inspection and weighing of grain, where it is to be mingled with other grain and thereafter bought

and sold as a certain quantity out of a larger mass, that do not apply where its identity is to be preserved. In the one case the statute is mandatory by express declaration. In the other it is so, if at all, only by inference. If there had been no purpose to make a distinction, equally explicit language would naturally have been used in each instance. While the legislature may, for public purposes, compel the owner to pay for the inspection of wheat which he intends to sell by sample, irrespective of grades, the power is so far an interference with his conduct of his business that the intention to exercise it ought to be evidenced by express words or by very clear implication. (*Gray v. Stewart,* 70 Kan. 429, 78 Pac. 852.) A purpose to enforce the inspection of grain while in the course of interstate traffic, because of its Kansas origin or destination, is likewise one not readily to be inferred from ambiguous language. The statute in some respects is penal, and for that reason should be subjected to a somewhat stricter construction than might otherwise be appropriate. The right given an owner of grain consigned to a public warehouse to recall it, subject only to such charges as have already accrued (§ 32), seems to show that inspection is optional with him unless the grain actually goes into the public elevator. The same inference seems warranted by the provision that the act shall not be construed to prevent sales of grain by sample, regardless of grade. The various provisions of the statute, including those giving the grain department exclusive control of inspection, have abundant room for operation under a system where inspection is made (except as to grain in public elevators) only upon request. Most of these provisions are very similar, so far as the present question is concerned, to those of earlier statutes. A section of the act of 1891 (Laws 1891, ch. 248, § 42) provided that all grain grown in the state and stored in any public elevator or warehouse must be weighed

and inspected as provided in that act. The distinction between compulsory and optional inspection which the present law seems to intend, was there made too plain for doubt. If it had been the purpose of the later act to efface the distinction, language would naturally have been chosen so explicit as to leave no room for controversy.

The fact that until late in 1910 or early in 1911 the state inspection department did not claim the right to inspect any grain (except that going into or coming out of a public elevator) against the wish or direction of the owner, is urged by the defendants as an administrative construction of the statute adverse to the view of the plaintiff. We deem this argument of little weight, because up to that time such right was not denied, no controversy having arisen, and in fact grain at inspection points was inspected without regard to whether it was intended for storage. Until July, 1911, the department did not inspect grain transferred from one car to another through an elevator, but since then it has claimed the right to do so.

In *The State ex rel. Wood v. Smith,* 114 Mo. 180, 21 S. W. 493, which is of more importance in connection with another branch of the case, and to which reference will again be made, it was held that under the Missouri statute, which has much in common with that of Kansas, official inspection was limited to grain in public warehouses. In *State ex inf. v. Goffee,* 192 Mo. 670, 91 S. W. 486, a subsequent amendment was held not to change the law in this regard, although the court said that its language indicated an assumption by the legislature that some other grain was already subject to state inspection. The language referred to as indicating such an assumption is not in our statute. Other cases having some tendency to sustain the position of the defendants are *State ex inf. v. Carlisle,* 235 Mo. 251, 138 S. W. 513; *Puget Sound Warehouse Co. v. Northern P. R. Co.,* 58 Wash. 322, 108 Pac. 955.

It is next necessary to determine whether the elevators of the defendants are public elevators as defined by the statute, which reads:

"All elevators or warehouses located in this state in which grain is stored in bulk, and in which the grain of different owners is mixed together, or in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved, and doing business for a compensation, are hereby declared public warehouses." (§ 19.)

While some of the elevators were formerly conducted avowedly as public elevators, under license, at the time this action was begun the licenses had been surrendered, and all were professedly private. The grain of each owner stored therein was kept separate from that of other owners, but the grain of the same owner was mingled in one mass, irrespective of its grade or the time of receipt, except where the owner directed otherwise. However, all the elevator operators excepting one reserved the right to store the grain with that of other owners (of the same grade) if they so desired. On December 6, 1911, this practice was abandoned and the clause embodying the reservation was omitted from receipts thereafter issued. Whether the elevators are now conducted as public or otherwise depends upon the construction of the clause "in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved." This in turn depends upon the meaning to be attached to the word "lot" or "parcel." If the quantity of grain delivered by a single shipment, or at one time, constitutes a separate "lot," then the elevators are public. If the grain belonging to the same owner, whether delivered at the same or at different times, is regarded as constituting the same "lot," if so designated by him, then the elevators are not public.

In order to be public an elevator must be one in which grain is stored in bulk, and which does business

for a compensation. In addition to these attributes, if it also is one in which the grain of different owners is mixed together it is a public elevator. The plaintiff regards the words "or in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved," as intended to designate another and distinct class of public elevators. The defendants consider them rather as amplifying and explaining the phrase "in which the grain of different owners is mixed together." The plaintiff puts emphasis upon the distinction between "the grain of different owners" on the one hand, and "different lots" on the other, and treats "mixed" as the equivalent of "stored in such manner that the identity can not be accurately preserved." It reads the statute much as though it said: "in which the grain of different owners is mixed together, or in which the grain delivered at different times, even if owned by the same person, is mixed together." The defendants place stress upon the distinction between "mixed" on the one hand, and "stored in such a manner that the identity can not be accurately preserved" on the other, and treat "the grain of different owners" as the equivalent of "different lots." They read the statute as though it said: "in which the grain of different owners is mixed together, or in which the lots belonging to different owners are stored in such a manner that their identity can not be accurately preserved." The court believes the defendants' construction to be the more natural and reasonable. The plaintiff regards this view as denying any effect to the clause "or in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately perserved." On the contrary, we think the construction contended for by the plaintiff makes absolute surplusage of the clause "in which the grain of different owners is mixed together." If the fact that different deliveries of grain (whether owned by the same person or not) are not kept separate,

makes an elevator public, then the fact that the grain of
different owners is mixed together would necessarily do
so, since such grain would constitute different lots
or deliveries; and the words "in which the grain of
different owners is mixed together," and all reference
to different ownership, could be stricken out of the act
without altering its effect in the slightest degree. Diff-
erent lots, in the sense in which the plaintiff uses the
term, could be mixed without mixing the grain of
different owners, but the grain of different owners
could not be mixed without mixing different lots. The
mixing of the grain of different owners is either the
controlling consideration in determining the public or
private character of an elevator, or it has nothing to do
with it. The term "lot," if applied to the grain of a
single owner (or to such part of his grain as he shall
desire to be handled as a single lot, and kept separate
from other grain) has a distinct and definite meaning.
Evidence was given that it is so used in the grain trade.
Any other meaning would be vague and indefinite.
Grain from the same farm, and of the same quality,
might be delivered by the same owner at different times.
There seems no sufficient reason why it should be re-
garded as constituting more than one lot, or why the
different deliveries should be kept separate. Grain from
different locations and of different quality might be
delivered by its owner all at once, when it would seem
to constitute a single lot on any theory. The classifi-
cation of elevators into public and private, according to
whether the grain of different owners is intermingled,
is a natural one, the basis of which is readily per-
ceived. A legislative purpose to make the test of the
public character of an elevator turn upon the separate
storing of grain of the same quality and ownership,
because separately delivered does not distinctly appear,
and is not to be readily inferred.

We regard the history of the legislation as confirming
the conclusion we have reached upon the consideration

of the mere language of the statute. The language in question originated in Illinois. The constitution of that state, adopted in 1870, contains these provisions: "All elevators or storehouses where grain or other property is stored for a compensation, whether the property stored be kept separate or not, are declared to be public warehouses" (Art. 13, § 1). "The general assembly shall pass laws for the inspection of grain, for the protection of producers, shippers and receivers of grain and produce" (Art. 13, § 7). In 1871 the Illinois legislature passed an act "to regulate public warehouses, and the warehousing and inspection of grain, and to give effect to article thirteen of the constitution of this state." (Laws of Ill. 1871-1872, p. 762, Hurd's Rev. Stat. 1909, ch. 114, § 134 *et seq.*) This act divided public warehouses into three classes, designated as A, B and C. Most of the regulations prescribed were made applicable only to warehouses of class A. The several classes were thus defined, the language of the Kansas statute now in question being here italicized:

"Public warehouses of class A shall embrace all warehouses, elevators or granaries *in which grain is stored in bulk, and in which the grain of different owners is mixed together, or in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved,* such warehouses, elevators or granaries being located in cities having not less than one hundred thousand inhabitants. Public warehouses of class B shall embrace all other warehouses, elevators or granaries in which grain is stored in bulk, and in which the grain of different owners is mixed together. Public warehouses of class C shall embrace all other warehouses or places where property of any kind is stored for a consideration." (§ 2.)

The italicized words, or their substantial equivalent, have been incorporated in statutes in Indiana (Acts of 1879, p. 230, Ann. Code of Ind., 1908, § 10484); in Missouri (2 Rev. Stat. Mo., 1909, § 6775); in Ne-

braska (Laws 1891, ch. 55, § 5*a*) ; and in Canada (Rev. Stat. of Canada, 1906, ch. 85, part 2, § 48). The Nebraska act was repealed in 1909 (Laws 1909, ch. 152). The Canadian act was amended in 1908, these words being omitted from the amended statute (Statutes of Canada, 7-8 Edw. VII, ch. 45, § 3). The words were used in a Wisconsin statute passed in 1905 (Laws of Wis., 1905, ch. 19, § 6), but at a special session in the same year the section containing them was amended so as to express with clearness what we have held to be the true meaning originally intended, the new phraseology being: "in which the grain of different owners is stored in bulk or mixed together, or stored in such manner that the identity of different lots and parcels can not be accurately preserved." (Laws of Wis., Special Session, 1905, ch. 12, § 74.) A Minnesota statute passed in 1885, modeled upon that of Illinois, contained the words referred to. (Laws of Minn. 1885, ch. 144, § 1.) Commissioners appointed to propose such revision and codification of the public statutes of the state as should "simplify, harmonize, and complete" them, presented a report in the form of a single bill, which was enacted in 1905. In defining public warehouses the revised act used these words, which we regard as a rearrangement of those of the original statute, with a purpose to avoid ambiguity and make the meaning clear: "in which grain is received for storage in bulk and that of different owners mixed together or so stored that identity of the different lots or parcels is not preserved." (Rev. Laws of Minn. 1905, § 2047.) The Minnesota and Wisconsin statutes distinctly show that the legislatures of those states thought it desirable to use, in addition to the word "mixed," which might be thought to imply an actual commingling and stirring together of the grain of different owners, an expression covering any manner of storage which did not accurately preserve the identity of each lot.

The language in question seems to have been before

the courts of but one state. The Missouri statute referred to was enacted in 1889. In 1892 the supreme court of that state had occasion to interpret the language in question, and held that "when the statute speaks of different lots  .  .  .  it refers to lots belonging to different owners." (*The State ex rel. Wood v. Smith,* 114 Mo. 180, 21 S. W. 493.) The grounds of the decision are indicated by this language from the opinion:

"A proper construction of the expression 'stored in bulk and the grain of different owners mixed together' requires they should be read in conjunction as they appear in the act. The language is used in contradistinction to storage of each owner's grain *in kind* and without *mixing with another's*. In the large public elevators which invite the public to store with them, the grain goes into a common bulk, and after that the right of its owner is represented by a warehouse receipt certifying to the amount thereof and its grade, and it is the regulation of such a warehouse to which the statute refers when it uses the language 'stored in bulk and the grain of different owners mixed together.' But the language of the act forbids the construction that the legislature had in mind those warehouses in which the owners thereof stored their own property, or in which they leased to other persons certain bins therein in which they might store their grain and preserve it separate and distinct from others. In such a case no warehouse receipt is issued. When the grain is sold, the grain itself is delivered. It is not transferred by the assignment of negotiable warehouse receipts, which call for an equal amount of grain of the same grade and kind out of the general bulk. When stored in a rented bin, or in kind, the owner gets the commodity itself as distinguished from its value in money, or its equivalent in other grain of the kind and grade his was inspected and certified to be.  .  .  . It is insisted by the relator that the mixing of two loads of the same grade belonging to the same owner brings the Empire Elevator within the purview of section 3, which denominates a warehouse as public 'in which grain is stored in such a manner that the identity of different lots can not be accurately preserved.' Keep-

ing in mind that this act is a substantial transcript of
the Illinois act, it is fair to presume the legislature of
this state was actuated by the same purpose that
prompted the legislature of Illinois.   That act upon its
face purports to be in pursuance of the constitutional
mandate that the constitution of Illinois required the
legislature to pass inspection laws 'for the protection
of producers, shippers and receivers of grain and pro-
duce.'   Hence we are [not] left in doubt as to the pur-
pose of the law.   This law was designed to protect
the owner of wheat who desired to store it in a public
warehouse, where, according to the method of trans-
acting business, the identity of his wheat could not be
accurately preserved.   It certainly was not intended
to apply to a person who rented a bin for his own use
and *directed the owner of the warehouse to store two
or more loads of grain in the same bin, as was done in
the Empire Elevator.*   Such a construction is at vari-
ance with the other sections of the law.   The act must
be construed as a whole.   When the statute speaks of
different lots we think it refers to lots belonging to
different owners.   *Moreover, we hold that the whole of
section 3 refers most clearly to a public warehouse
where the public is invited to come and make use of its
storage facilities, and when the grain will become mixed
in bulk and its identity can not be accurately preserved."*
(pp. 195, 197.)

The Kansas statute under consideration is that of
1907, but the language in controversy was originally
used in the act of 1891.   (Laws 1891, ch. 248, § 1.)
In neither enactment was the exact language of the
Missouri statute followed throughout.   The case is
therefore not strictly one for the application of the
rule that in adopting the statute of another state the
legislature is conclusively presumed to adopt also the
judicial construction there placed upon it.   Neverthe-
less the reasoning back of that rule argues strongly for
our following the Missouri decision.   While it is true
that the language the meaning of which is in dispute
was used by the Kansas legislature in 1891, and is pre-
served in the present law without change, the enactment
of 1907 was a revision of the entire subject.   Obviously

its framers had before them the legislation of Missouri as well as that of Illinois. It is hardly conceivable that they were ignorant of the construction given to the Missouri act by the supreme court of that state in 1892, growing out of a controversy at Kansas City, and involving a determination of what constituted a public elevator. If that construction gave the statute a different effect from that intended by the Kansas legislature, the conviction seems irresistible that the language would have been altered so as to put its meaning beyond doubt.

These conclusions compel a denial of the writ asked, and make it unnecessary to pass upon the other matters that have been argued. A special order as to costs is necessary because of the fact, already referred to, that the operators of all the elevators involved, excepting the terminal elevators, reserved the right, prior to December 6, 1911, to intermingle the grain of different owners. We agree with the commissioner that the reservation of the right to reduce to a common mass the grain of different owners in store had the same effect, so far as concerns the public character of the business, as the actual mixing of the grain. Therefore where this right was reserved the elevators were public and were subject to state control, until the practice was abandoned. Various provisions of the statute have been attacked as unconstitutional. If any of them are in fact invalid they are of such a character that they may be eliminated without affecting the act as a whole, which is valid. The defendants maintain that mandamus is not a proper remedy, that the state is not a proper party plaintiff, and that the relief sought is too general. We think the right to compulsory inspection of grain in public elevators is one enforceable by mandamus at the suit of the state. It is generally held, although there are cases to the contrary, that mandamus will not lie to compel the performance of a series of acts. (4 A. & E. Ann. Cas. 198; 20 A. &

E. Ann. Cas. 220; *McAlester-Edwards Coal Co. v. State,* [Okla. 1912] 122 Pac. 194.)    Assuming the general rule to be sound we hold it is not applicable here.    The defendants maintain that the increased fees provided by the act of 1911 were so large as to characterize the statute as one for revenue and not for inspection, and that in this aspect it is invalid.    The commissioner found that if, as contended by the state, inspection was compulsory irrespective of whether the grain was stored in public elevators, the normal annual income of the department would be between $70,000 and $75,000, and the expenses between $55,000 and $60,000.    We do not think the indicated surplus sufficient, upon any construction of the act, to justify the court in attributing to the legislature a purpose to create a revenue under the guise of an inspection act.    It follows that until December 6, 1911, which was after the case had been argued before the commissioner, the plaintiff was entitled to a writ against five of the operators of elevators.    They ought therefore to be charged with a part of the costs of the proceeding (*Nolte v. Telephone Co.*, 86 Kan. 770, 121 Pac. 1111), one-third of which will accordingly be taxed to them.

JOHNSTON, C. J. (dissenting) :    The prevailing opinion presents a fair synopsis of the governing statutes and, to my mind, they compel a different conclusion than has been reached.    The earlier acts related to the regulation of warehouses, elevators, and granaries in which grain was stored.    In 1897 a radical change was made in the law when the legislature created a department for the inspection and weighing of grain and which made inspection wholly a state affair.    That act, and the later revision of 1907, indicate that the legislature thought that the business of dealing in grain, which is the principal product of the state, should be placed under state supervision, and so a department was created designed to have com-

plete charge of the inspection and weighing of grain with incidental regulation of warehouses in which it may be stored. It was the manifest purpose of the legislature that the producers and dealers in grain needed protection, and so provision was made to establish standard grades by which different qualities of grain might be designated and also that the grain designed for sale or storage should be inspected, its quality and weight determined, and its grade fixed, to enable the seller to obtain the real value of the grain sold and so that the purchaser may know what he is buying. It tends to standardize and give credit to the grain products of the state, protects the reputation of its grain markets, and necessarily will tend to secure better prices for the producer. To my mind the purpose of the legislature was not to confine inspection to public warehouses or to cases where it was requested. The statute is not so limited. The first section of the act expressly provides that there shall be inspection at all railroad terminals, at all public warehouses, at all other points where the authorized inspection fees will pay the expense of inspecting and weighing the grain handled at such points, and at all other places where inspection is requested and an arrangement can be made that the officers of the state will accept, as full compensation, the fees derived from the business at such points. The provision for inspection at public warehouses is explicit, but the statute is equally explicit that there shall be inspection at the three other classes of places mentioned. The law applies to every railroad terminal in the state and compels inspection there although there may be no public warehouse at such terminal. Much grain may be handled and disposed of at terminal markets without passing through public warehouses, and the obvious purpose of the act was to require inspection where grain was sold or stored at this and all other places named in the act. Many of the provisions of

The State, *ex rel.*, v. Railway Co.

the law are incompatible with the theory of invited inspection. The duties imposed upon the chief inspector are mandatory in character and the language used does not indicate that he is only to act at the option of dealers or at public elevators alone. He is required to supervise the inspection of grain at all the places provided for in the act. He must establish rules and regulations, not only for the management of public warehouses, but also for the supervising, handling, inspecting, weighing, and storage of grain. Another provision which is state-wide in its application and is not limited to public warehouses or to invited inspection is that he is required to "investigate all complaints of fraud or oppression in the grain trade, and correct the same, so far as may be in his power." (Laws 1907, ch. 222, § 3.) This is an important function, and manifestly is to be exercised in every branch of the grain trade, and especially as to the inspection and weighing of grain sold or stored within the state.

The provision for the punishment of those who refuse access, or prevent the officers from gaining access, to scales, elevators, and warehouses, in order to perform their duties of inspection, indicates that the inspection in mind was compulsory rather than optional, and the same may be said respecting the provision giving a lien on the grain for the fee which is to be collected and paid by the carrier. Section 13 of the act contemplates that there shall be inspection and weighing of grain whether into or out of public warehouses, and it places in the same category with public warehouses, elevators, cars, barges, wagons, or sacks arriving at or shipped from the points named in the first section of the act, and this is to be done by officers of the state provided for that purpose, and that if any one else assumes to act he will be subject to prosecution. No option is given any one and nothing is said of waiting until the officer is invited to inspect the grain taken in or out of the elevators, cars, barges,

or wagons. In section 14 of the act it is provided that the officers of the grain department shall have exclusive control of the weighing and inspection of grain at all the places where inspection or weighing is established, namely, at all railroad terminals, public warehouses, self-supporting places, and points where officers will accept the statutory fees for the work done. How can they have exclusive control if they must wait for an invitation before they can act? It was surely not intended that the state should keep a corps of officers at great expense waiting for permission to inspect and whose authority should be subject to the whims of dealers.

Again, a great system for the inspection and weighing of grain has been created, the fees for the service have been prescribed, a revolving fund has been provided, and the clear purpose of the legislature was that the department expenses should be paid from the fees collected. It seems quite improbable that the legislature intended to create such a department, supported in such a way, and then make the support of the department depend on the will or caprice of grain dealers. If there is no inspection and weighing of grain no fees will be collected and there will be no fund to support the department. The act was not passed for the benefit of the grain dealers alone nor for the producers alone, but for the benefit of all interested parties and for the welfare of the whole state. If it is optional with grain dealers to have inspection or weighing of grain it is within their power to thwart the legislative purpose by declining inspection, and in that way deprive the department of fees which is practically the only means provided for maintaining it. Such a purpose can not well be attributed to the legislature.

It is argued that the legislature, by section 23 of the act, made inspection compulsory as to grain stored in public warehouses, and that, not having used equally explicit language as to inspection at other places, it

must be inferred that only optional inspection was intended. A careful reading of section 23 indicates to me that the legislature in enacting it did not have in mind and was not declaring distinctions between inspection at warehouses and at other places. It had already, in earlier sections of the act, in mandatory language, provided that there should be inspection at public warehouses and at various other places. The only inference to be drawn from those provisions was that inspection was compulsory. In section 23 the duties of warehouseman are prescribed and he is enjoined to receive for storage all grain tendered him that is dry and suitable for storage and that no discrimination can be made among persons who offer such grain for storage, and incidentally it is stated that such grain shall, in all cases, be inspected, weighed, and graded by a duly authorized inspector and weigher. The section then provides for keeping grain in separate bins apart from that of other owners, the issuance of warehouse receipts, requires inspection of grain delivered from the warehouse the same as when it is delivered to it, excuses the warehouseman from receiving grain when there is not room to store it properly or when the warehouse is necessarily closed, provides who shall pay the charges for inspection and weighing and authorizes the addition of them to the storage charges, and provides that the chief inspector may bring an action to recover such charges. This section together with those preceding and following it constitute the warehouse part of the act and is a code of rules governing public warehouses, and evidently was not intended to limit the provisions already made for the inspection and weighing of grain. In the inspection part of the act the legislature had already stated that there should be inspection at public warehouses, and the clause referred to in section 23 only imposes the duty on the public warehouseman to not receive or deliver grain without

24—87 Kan.

inspection.  I think it will be a surprise to the authors of the measure to learn that this brief clause in a section prescribing the duties of a public warehouseman is regarded as the one which gives the authority to inspect and weigh grain, and that because of it an inference may be drawn that inspection at points other than public warehouses is not compulsory.  If this clause had been omitted entirely from section 23, would it have been contended or held that compulsory inspection could not be had at any place under the act or that there could be no inspection unless an owner of grain asked for it?  This is the position to which the contention of defendants leads.

Reference is made to a Missouri case but the statutes of the two states are quite different in their provisions.  Ours is, in the main, an inspection law, while that of Missouri is essentially a warehouse act, and is so characterized by its title, which is, "An act  .  .  . providing for the organization of public warehouses, and to regulate the warehousing and *inspection of grain in public warehouses*."   (Laws of Mo. 1889, p. 124.)  Even under that statute the supreme court of Missouri, in citing the case of *State ex inf. v. Goffee,* 192 Mo. 670, 91 S. W. 486, found language indicating that grain not in public warehouses was subject to inspection, but because the legislature had proceeded on the assumption that a former statute provided for inspection elsewhere, and was thought to be mistaken in that assumption, that therefore no force could be given to the language in the last act.  That case can not be regarded as an authority in this one.  In my opinion our legislature undertook to provide compulsory inspection of substantially all of the grain designed for sale in the markets or for storage within the state.  It is well known that grain is no longer sold on the markets of this country unless it has been graded, inspected and weighed, and it therefore became a question in this state whether there should be

official inspection under the supervision of the state or whether it should be left to some board of trade or other self-constituted authority. The legislature, in my view, acted upon the theory that the interest of producers and owners of grain in the state, as well as of the general public, would be best subserved by a compulsory state inspection.

Another question upon which there is a division of opinion is what, under the law, constitutes a public warehouse? It depends upon the interpretation of section 19 of the act, which has already been quoted, and the language is so plain and direct that it seems to me there is little room for doubt as to its meaning. An elevator or warehouse in which there is no separation of the grain received, and where all of it is stored in bulk for compensation, is unquestionably a public warehouse. One in which that or a part of that received from different owners is mixed together and stored for compensation is likewise conceded to be a public warehouse. The legislature intended to extend the application of the act, because, after naming those in which grain was stored in bulk and those in which the grain of different owners is mixed together, it added a distinct class by employing the phrase "or in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved." It is said by the defendants that this phrase was only intended to explain or amplify the preceding ones and that it related solely to the grain received from different owners. Their claim appears to be that the phrase was intended to make it clear that however the grain of different owners might be mixed in the elevator, if its identity could not be accurately preserved it should be regarded as a public warehouse. It seems to me, however, that the preceding clause, in which the grain of different owners mixed together is referred to, requires no explanation. It is clear and complete of itself. Nothing is said in

the discussion which makes its meaning more definite and apparent. The phrase "or in which grain is stored in such a manner that the identity of different lots or parcels can not be accurately preserved," if given the meaning attributed to it by the defendants, would add nothing to the preceding clause. We should not assume that unnecessary language was used by the legislature nor that a phrase was inserted in a section without any purpose. The mixing of the grain of different owners and the handling of the lots or parcels of grain brought in by different owners so that its identity is lost would practically amount to the same thing. Ownership of the grain, it is true, is a consideration in the preceding clause, but after providing for the grain of different owners the legislature, with the evident purpose of making the definition of a public warehouse more extended and inclusive, made another class which included all lots and parcels of grain stored so that the identity of each was preserved whether owned by the same or different persons. There is just as much reason for state supervision of lots and parcels of grain purchased and brought in from different farms and stations and stored by the same owner as if they were stored by different owners. The maintenance of established grades and the keeping of different grades separated in elevators and warehouses is one of the leading ideas of the act. Many of its provisions disclose that the purpose is to prevent the mixing of grain and the deception, injury and loss which might result from it. Provision was therefore made for establishing grades and inspecting each lot of grain to be stored or delivered in order to determine its grade. Inspection is required when it is put in the elevator as well as when it is taken out. The public is interested in the handling of grain which has been stored and which is to be sold and put into business channels, and it is in as great need of protection against the mixing of grades which had been stored by the same owner as

if the lots of grain had been stored by several owners. This is apparent in section 23 of the act which defines the duties of public warehousemen. There regulations are prescribed for the storage of grain by single owners and provision is made for keeping the same in separate bins, making it plain that the warehousemen shall not escape supervision by receiving and storing the grain of individual owners in special or separate bins. It provides that all the grain, including that stored in special bins, shall be inspected and weighed when it is delivered from the elevator. There is a clause in that section, too, which evidences the general purpose of the act relating to warehousemen, where it provides that the warehousemen shall receive grain from persons without discrimination and that when received it shall always "be stored with grain of a similar grade."

Counsel cite and rely on *The State ex rel. Wood v. Smith,* 114 Mo. 180, 21 S. W. 493, as an authority for their interpretation of the language of the act, and it appears to support the theory for which they contend. The Missouri statute, as we have seen, differs to some extent from our own but the definition of public warehouses is substantially the same. Our statute was enacted, however, before that decision was made, and therefore it can not be claimed that the interpretation of that court was adopted by our legislature. The decision accentuates the words "lots and parcels" employed in the section and gives the law a strained and unnatural construction. It seems clear to me that its interpretation is out of harmony with the main purposes of the act and that the reasoning of the court in support of its interpretation is wholly unconvincing. In my view the commissioner reached a correct conclusion in interpreting section 19 and in holding that the defendant elevators were public warehouses. I feel compelled, therefore, to dissent from the conclusion reached by the court on both propositions, namely, from the conclusion holding that inspection and weigh-

ing is not compulsory, and as to the definition of a public warehouse.

I am authorized to say that Mr. Justice BENSON joins in this dissent.

SMITH, J.: I concur in the dissent.