ARMOUR & COMPANY *v.* CITY COUNCIL OF
AUGUSTA *et al.*

While the act of Congress of June 30, 1906 (34 Statutes at Large, 669, 672), in so far as it relates to inspection of animals slaughtered and meats prepared by packing-houses for interstate or foreign commerce, does not entirely exclude the States, or municipalities under their authority, from enacting proper inspection laws to prevent meat which has become unfit for food by reason of decay or similar causes from being distributed or sold, to the injury of the health of its citizens, yet a section of a municipal ordinance which creates a "packing-house inspector," whose duty it is to inspect all meats shipped into the city, or brought from outside the county, and which, among other things, requires him to visit all packing-houses daily and all other places of "importers of meat-stuff, not otherwise provided for, and secure from them their bills of lading for the purpose of determining whether or not the said shipments have made proper time, and whether cars containing such meat-stuff have been properly iced during transit," and which imposes upon such importers an inspection charge of twenty cents for each beef carcass, and ten cents for each carcass of a calf, sheep, or hog, and ten cents per hundredweight for all cuts of fresh meat, sausage, poultry, game, and fish, while the ordinance imposes no such charge on others engaged in like business, is an unlawful interference with interstate commerce, discriminatory in character, and invalid.

MARCH 1, 1910.

Petition for injunction. Before Judge Hammond. Richmond superior court. June 5, 1909.

W. K. Miller, for plaintiff. C. Henry Cohen, for defendants.

LUMPKIN, J. On February 12, 1909, the City Council of Augusta adopted an ordinance in which they provided for the election of an officer to be known as the "inspector of meat and milk," and the inspection by him of meat, milk, fish, vegetables, fruit, and other articles offered for sale for food in the city. The twelfth section was as follows: "Be it further ordained, that, on and after the passage of this ordinance, there shall be elected by the City Council of Augusta, upon the nomination of the Board of Health, for a period ending the second Saturday in January, 1910, an Inspector to be known as 'Packing-House Inspector,' whose duty it shall be to inspect all meats shipped into Augusta, or brought from outside Richmond County and offered for food; that the said Inspector shall visit all packing-houses daily and all other places or [of?] importers of meat stuff, not otherwise provided for, and secure from them their bills of lading for the purpose of determining whether or not the said shipments have made proper time, and whether cars containing said meat stuff have been properly iced during transit; that it shall be the duty of said inspector to open said cars and by proper inspection ascertain whether said meat stuff contained in said cars are in a healthful condition for sale; and that all meats and other foodstuff found not to be in a healthful condition shall be condemned and ordered out of the city as condemned meat, at the expense of the packer; that the following fees shall be charged for said inspection: Each beef carcass 20c. Each calf carcass 10c. Each sheep carcass 10c. Each hog carcass 10c. All cuts of fresh meat, sausage, poultry, game, and fish, per hundredweight, 10c." By section thirteen the salary of the inspector was fixed at seventy-five dollars per month.

Armour & Company, a New Jersey corporation, filed an equitable petition to enjoin the enforcement of this ordinance, alleging that it did a meat-packing business, with its principal office and place of business in Chicago, Illinois. It attacked the ordinance on the ground that the act of Congress of 1906 on the subject of inspection of packing-houses was exclusive, and the municipal authorities had no power to enact an ordinance on the subject; that, if they had such power, the ordinance adopted was arbitrary, discriminatory,

and undertook to regulate interstate commerce, and was unreasonable; and that in its administration there was discrimination, as there were two abattoirs near Augusta, one in Richmond county and the other in South Carolina, which were not subjected to the same burdens. The inspection fees were also attacked as unreasonable and oppressive. There were other allegations not material to be set out.

The defendants denied the substantial allegations of the plaintiff. While denying discrimination, they admitted that the abattoir located near the city in South Carolina was considered as occupying a different position from the packer who had his products shipped thousands of miles after they were inspected. They admitted that the plaintiff's meats were inspected before shipment from different parts of the United States, under the requirements of the act of Congress, but denied that this was the only inspection to which meats shipped into the City of Augusta could be subjected. They admitted an intention to enforce the ordinance. The presiding judge denied the injunction, and the plaintiff excepted.

It was contended that the act of Congress of June 30, 1906 (34 Statutes at Large, 669, 672, et seq.), was exhaustive of the subject of inspection of meats prepared at packing-houses for shipment to other States, and consequently that a municipality, under its authority from the State, could not cause any inspection of meat to be made at a branch of a non-resident packing-house located within its jurisdiction, to which dressed meat was shipped from the packing-house in Illinois, for distribution and sale, save by agreement with the Federal meat inspector, approved by the bureau of animal industry, though the object of such ordinance should be to prevent meat which, by reason of diseased or decayed condition, or from some similar cause, was unfit to be sold to citizens. Carried to its legitimate conclusion, this argument would also exclude all State inspection laws. It was further contended that if this were not correct, nevertheless the ordinance of the City of Augusta providing for a "packing-house inspector" and for such meat inspection was void.

The States did not derive their police power from the constitution of the United States. It was a power existing in them as sovereign States. Inspection laws are enacted in the exercise of such power of self-protection remaining in the States, and not surrendered to

the general government.    In the celebrated case of Gibbons *v.*
Ogden, 9 Wheat. 1, 200 (6 L. ed. 23), Chief Justice Marshall said:
"But the inspection laws are said to be regulations of commerce,
and are certainly recognized, in the constitution, as being passed
in the exercise of a power remaining with the States.    That in-
spection laws may have a remote and considerable influence on
commerce will not be denied; but that a power to regulate com-
merce is the source from which the right to pass them is derived
can not be admitted.  .  .    They form a portion of that immense
mass of legislation which embraces everything within the territory
of a State, not surrendered to the general government; all which
can be most advantageously exercised by the States themselves."
The constitution of the United States (art. 1, sec. 10, par. 2), de-
clares: "No State shall, without the consent of Congress, lay any
imposts or duties on imports or exports, except what may be abso-
lutely necessary for executing its inspection laws; and the net pro-
duce of all duties and imposts laid by any State on imposts or ex-
ports shall be for the use of the treasury of the United States;
and all such laws shall be subject to the revision and control of the
Congress."    The clause, "except what may be absolutely necessary
for executing its inspection laws," clearly recognizes the power to
pass inspection laws as an existing right.    Touching imposts or
duties on imports or exports in foreign commerce such laws are
declared to be subject to the revision and control of Congress; but
this does not negative the recognition of the general power in-
herent in the States to enact inspection laws.    See Mayor etc. of
New York *v.* Miln, 11 Peters, 102, 133 (9 L. ed. 648) ; Turner *v.*
Maryland, 107 U. S. 38, 51 (2 Sup. Ct. 44, 27 L. ed. 370).    In
the Passenger Cases, 7 How. (U. S.) 456 (12 L. ed. 702), Mr.
Justice Grier declared that "This right of the States has its founda-
tion in the sacred law of self-defence, which no power granted to
Congress can restrain or annul."    In Foster *v.* Master etc. of New
Orleans, 94 U. S. 246 (24 L. ed. 122), an act of the legislature of
Louisiana in relation to the survey of the hatches of every seagoing
vessel arriving at New Orleans, and for damaged goods coming on
board of her, etc., was held to be a regulation of commerce with
foreign nations and among the several States, and therefore void.
But in the opinion Mr. Justice Swayne said: "In expressing these
views, we have no purpose to impugn anything heretofore said by

this court as to the power of the States to establish inspection, quarantine, health, and other regulations, within the sphere of their acknowledged authority.    The constitutional validity of such regulations is as clear as the power of Congress to establish regulations of commerce.    It is no objection to the former that both operate upon the same subject.    Gilman *v.* Philadelphia, 3 Wall. 713 [18 L. ed. 96] ; Ex parte McNeil, 13 Id. 236 [20 L. ed. 624]."    In Railroad Co. *v.* Husen, 95 U. S. 465 (24 L. ed. 527), a statute of Missouri which prohibited driving or conveying any Texas, Mexican, or Indian cattle into the State, between the first day of March and the first day of November in each year, was held to be more than a quarantine regulation or a legitimate exercise of the police power of the State, to amount to an effort to regulate interstate and foreign commerce, and to be in conflict with the clause of the constitution conferring upon Congress the power to regulate commerce with foreign nations, among the several States, and with the Indian tribes.    In the opinion Mr. Justice Strong, after referring to the statement of Mr. Justice Grier in the Passenger Cases, quoted above, said : "The same principle, it may also be conceded, would justify the exclusion of property dangerous to the property of citizens of the State; for example, animals having contagious or infectious diseases.    All these exertions of power are in immediate connection with the protection of persons and property against noxious acts of other persons, or such a use of property as is injurious to the property of others.    They are self-defensive."    And again: "While we unhesitatingly admit that a State may pass sanitary laws, and laws for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, &c., from entering the State; while for the purpose of self-protection it may establish quarantine, and reasonable inspection laws, it may not interfere with transportation into or through the State, beyond what is absolutely necessary for its self-protection. It may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce."

In Bowman *v.* Chicago &c. Ry. Co., 125 U. S. 465, 489 (8 Sup. Ct. 689, 1062, 31 L. ed. 700), a statute of Iowa, forbidding common carriers to bring intoxicating liquors into the State from any other State or territory, without being first furnished with a cer-

tificate under the seal of the auditor of the county to which it was
to be transported, certifying that the consignee or person to whom
it was to be transported or delivered was authorized to sell intoxi-
cating liquors in the county, was held not to be an inspection law or
a quarantine law, but essentially a regulation of commerce among
the States, and therefore void.     The Chief Justice and Justices
Harlan and Gray dissented.     In the opinion Mr. Justice Matthews
said : "Doubtless the States have power to provide by law suitable
measures to prevent the introduction into the States of articles of
trade, which, on account of their existing condition, would bring
in and spread disease, pestilence, and death, such as rags or other
substances infected with the germs of yellow fever or the virus
of small-pox, or cattle or meat or other provisions that are diseased
or decayed, or otherwise, from their condition and quality, unfit
for human use or consumption.     Such articles are not merchant-
able; they are not legitimate subjects of trade and commerce.
They may be rightly outlawed as intrinsically and directly the
immediate sources and causes of destruction to human health and
life.     The self-protecting power of each State, therefore, may be
rightfully exerted against their introduction, and such exercises
of power can not be considered regulations of commerce prohibited
by the constitution."     He also quoted approvingly from the opinion
of Mr. Justice Catron in the License Cases, 5 How. 504, 599 (12
L. ed. 256), in part as follows: "The assumption is, that the police
power was not touched by the constitution, but left to the States,
as the constitution found it.     This is admitted; and whenever a
thing, from character or condition, is of a description to be regu-
lated by that power in the State, then the regulation may be made
by the State, and Congress can not interfere.     But this must al-
ways depend on facts subject to legal ascertainment, so that the in-
jured may have redress.     And the fact must find its support in
this, whether the prohibited article belongs to, and is subject to be
regulated as part of, foreign commerce, or of commerce among the
States.     If, from its nature, it does not belong to commerce, or if
its condition, from putrescence or other cause, is such, when it is
about to enter the State, that it no longer belongs to commerce, or,
in other words, is not a commercial article, then the State power
may exclude its introduction.     *And as an incident to this power, a
State may use means to ascertain the fact."*     (Italics ours.)

In Leisy *v.* Hardin, 135 U. S. 100, 113 (10. Sup. Ct. 681, 34 L. ed. 128), which has sometimes been considered an extreme adverse case on the subject, it was said by Chief Justice Fuller: "Articles in such a condition as tend to spread disease are not merchantable, are not legitimate subjects of trade and commerce, and the self-protecting power of each State, therefore, may be rightfully exerted against their introduction, and such exercise of power can not be considered a regulation of commerce, prohibited by the Constitution." It has been said by the Supreme Court of the United States that the national government is one of enumerated powers, and that a power enumerated and delegated by the constitution to Congress is comprehensive and complete, and is without other limitations than those found in the constitution itself. It has also been said that plenary power is conferred upon Congress to deal with the regulation of interstate commerce. We recognize these rulings, though it will be found that in the decisions where they were made the members of the Supreme Court were very often quite widely divided in opinion as to the application of them, especially with reference to the police powers of the States. Here are two powers, the one a power delegated to Congress to regulate commerce among the States, the other the police power inhering in the States and not arising from delegation. Without stopping to discuss whether it was intended by the framers of the constitution that the former power should ever be so exercised as to destroy the latter in regard to a large class of subjects, it may safely be said that it will not be held that Congress has undertaken to do so, or that an act of that body has excluded the State's police power of inspection for the preservation of the health of its citizens, unless such intention and conflict are plain and palpable. In Reid *v.* Colorado, 187 U. S. 148 (23 Sup. Ct. 96, 47 L. ed. 108), Mr. Justice Harlan said: "Congress did not intend to override the power of the States to care for the safety of the property of their peoples by such legislation as they deemed appropriate. It did not undertake to invest any officer or agent of the Department with authority to go into a State and without its assent take charge of the work of suppressing or extirpating contagious, infectious, or communicable diseases there prevailing and which endangered the health of domestic animals. . . It should never be held that Congress intends to supersede or by its legislation suspend the exercise of

the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said—and the principle has been often reaffirmed—that 'in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.' Sinnot v. Davenport, 22 How. 227, 243 [16 L. ed. 243]." It was accordingly held in the Reid case that the statute of Colorado, relating to the introduction of infectious or contagious diseases among the cattle and horses of that State, related to matters not covered by the animal industry act of Congress of 1884, c. 60 (23 Stat. 3, U. S. Comp. St. 1901, p. 299), was not necessarily in conflict with it, and was not in violation of the constitution of the United States. In Missouri, Kansas & Texas Ry. v. Haber, 169 U. S. 613, 626 (18 Sup. Ct. 488, 42 L. ed. 878), it was said: "While the States were invited to co-operate with the General Government in the execution and enforcement of the act, whatever power they had to protect their domestic cattle against such diseases was left untouched and unimpaired by the act of Congress." In McLean & Co. v. Denver etc. R. Co., 203 U. S. 38 (27 Sup. Ct. 1, 51 L. ed. 78), it was held that "A State or Territory has the right to legislate for the safety and welfare of its people, which is not taken from it because of the exclusive right of Congress to regulate interstate commerce; and an inspection law affecting interstate commerce is not for that reason invalid unless it is in conflict with an act of Congress or an attempt to regulate interstate commerce." In Patapsco Guano Co. v. North Carolina Board of Agriculture, 171 U. S. 345 (18 Sup. Ct. 862, 43 L. ed. 191), an act of the legislature of that State for the inspection of fertilizers and fertilizing materials, with a charge therefor per ton to defray the cost of inspection, was held not to be violative of the constitution. In Rasmussen v. Idaho, 181 U. S. 198 (21 Sup. Ct. 594, 45 L. ed. 820), a statute of that State which provided that whenever the Governor had reason to believe that scab or any other infectious diseases of sheep had become epidemic in certain localities in any State or territory, or that conditions existed which rendered sheep likely to convey disease, he should by proclamation designate such localities and prohibit the importation from them of any sheep

into the State except under such restrictions as, after consultation with the sheep inspector, he might deem proper, did not conflict with the constitution of the United States.    In Compagnie Française De Navigation à Vapeur *v.* Louisiana State Board of Health, 186 U. S. 380 (22 Sup. Ct. 811, 46 L. ed. 1209), an act of the legislature , empowering the State board of health to exclude healthy persons from a locality infected with a contagious or infectious disease, was upheld.    In Missouri, Kansas & Texas Ry. Co. *v.* Haber, supra, an act of the legislature, relating to bringing into the State cattle liable to or capable of communicating Texas, splenic, or Spanish fever to domestic cattle of the State, was held valid, "as Congress has not assumed to give to any corporation, company, or person the affirmative right to transport from one State to another State cattle that were liable to impart or capable of communicating contagious, infectious, or communicable diseases." Patterson *v.* Kentucky, 97 U. S. 501, 503 (24 L. ed. 1115) ; Red C. Oil Mfg. Co: *v.* Board of Agriculture, 172 Fed. 695; *Green* v. *Mayor etc. of Savannah, R. M. Charlton,* 368.

The mere fact that a legitimate police regulation of a State may incidentally affect interstate commerce, to a limited degree, does not render such State legislation obnoxious to the interstate-commerce clause of the Federal constitution, not being a needless intrusion upon the domain of Federal jurisdiction, or strictly a regulation of interstate commerce.    *Southern Flour & Grain Co.* v. *Northern Pac. Ry. Co.,* 127 *Ga.* 626 (56 S. E. 742, 9 L. R. A. (N. S.) 853, 119 Am. St. R. 356), and citations; Hennington *v.* Georgia, 163 U. S. 299 (16 Sup. Ct. 1086, 41 L. ed. 166) ; Lake Shore & Michigan Southern Ry. Co. *v.* Ohio, 173 U. S. 285 (19 Sup. Ct. 465, 43 L. ed. 702), and cases cited supra.    Nor does the fact that meat derived from cattle slaughtered in Chicago is shipped to an agency in Georgia, and is there kept for sale or distribution, necessarily render it exempt from inspection at the point where it is thus received and kept.    In General Oil Co. *v.* Crain, 209 U. S. 212 (28 Sup. Ct. 475, 52 L. ed. 754), it was said: "Merchandise may cease to be interstate commerce at an intermediate point between the place of shipment and ultimate destination ; and if kept at such point for the use and benefit of the owners and under the protection of the laws of the State, it becomes subject to the taxing and police power of the State."    It was accord-

ingly held that an act of the legislature of Tennessee providing for the inspection of oil was not an unconstitutional burden on interstate commerce as applied to oil coming from other States and ultimately intended for sale and distribution in other States, but meanwhile stored in Tennessee for convenience of distribution and for reshipment from tank cars and barrels.    See also Pittsburgh etc. Coal Co. v. Bates, 156 U. S. 577 (15 Sup. Ct. 415, 39 L. ed. 538).

If it will not be presumed that Congress intended to abrogate the power of the State to have meat or food inspected for the protection of its citizens, except in a plain case, certainly it will not be assumed that they intended to delegate such power to an administrative officer, or a bureau, or a meat inspector.    An examination of that portion of the act of Congress of 1906 referring to the bureau of animal industry will show that it dealt principally with the inspection of cattle, sheep, swine, and goats before being slaughtered, of carcasses or parts of carcasses after being slaughtered, and of meat products at packing-houses and similar establishments where they were prepared for interstate commerce.    Persons, firms, and corporations were prohibited from transporting or offering for transportation, and carriers of interstate or foreign commerce were prohibited from transporting or receiving for transportation in interstate or foreign commerce, any carcass, meat, or meat food products thereof which had not been inspected, examined, and marked as required by the act.    The act did not undertake to wholly destroy the right of local inspection by a State or a municipality under its authority, after the meat had been shipped to a warehouse or branch agency located in a State other than that where the packing-house was, and where it was kept for distribution and sale.    It by no means follows, because meat has been inspected in Chicago and found to be in condition suitable for shipment, that, after being shipped into Georgia and there held, it still remains suitable for sale and use as food.    The conferring of authority on the Secretary of Agriculture to make rules and regulations necessary for the efficient execution of the act of Congress did not authorize him to go further and deny to the States their inherent right of passing legitimate inspection laws.    Nor will a regulation by him directing inspectors to notify municipal authorities, and upon request to advise with such authorities with a view of preventing the entry into the local market of diseased animals

or other products, and providing that the details of any proposed co-operative arrangement must be first submitted to and approved by the chief of the bureau of animal industry, be treated as an effort to exclude the State or its subordinate municipalities from enacting proper inspection laws. We can not sustain the broad position that States and municipalities are wholly prohibited from enacting inspection laws touching meats slaughtered or prepared in packing-houses located in other States.

Turning now to the particular portion of the ordinance involved, let us see if it is a proper and legitimate inspection law, or if it undertakes to regulate interstate commerce, and if it is discriminative in character. In Voight v. Wright, 141 U. S. 62 (11 Sup. Ct. 855, 35 L. ed. 638), an act of Virginia which provided that all flour brought into the State and offered for sale therein shall be reviewed, and have the Virginia inspection mark thereon, and imposed a penalty for offering such flour for sale without this, was held to be repugnant to the commerce clause of the constitution of the United States, because it was a discriminatory law, requiring an inspection of flour brought from other States, and not also of that manufactured within the State. In Brimmer v. Rebman, 138 U. S. 78 (11 Sup. Ct. 213, 34 L. ed. 862), another Virginia statute which provided that meat which had been slaughtered more than a hundred miles from the market should be inspected, and that the inspector should receive as his compensation one cent per hundred pounds to be paid by the owner of the meat, leaving other meat free from inspection, was also held to be invalid. Discrimination against products of other States can not be allowed; nor can a municipal ordinance undertake to regulate interstate commerce. Inspection laws must be confined to their legitimate purpose, and municipal ordinances must be reasonable. In the ordinance under consideration a special packing-house inspector was created, and it was provided that he should visit all packing-houses daily, and all other places of importers of meat-stuff, not otherwise provided for, and secure from them their bills of lading, "for the purpose of determining whether or not said shipments have made proper time, and whether cars containing said meat-stuff have been properly iced during transit." These are matters of regulation of interstate commerce, and the municipal authorities had no power to deal with them. People v. Compagnie Gén. Transatlantique,

107 U. S. 59, 62 (2 Sup. Ct. 87, 27 L. ed. 383).   Fees were also provided to be paid for the inspection of articles thus received by packing-houses or similar establishments to which meat was imported from without the State, but no similar fees or charges were provided as to other establishments selling meat.   As to the administration of the ordinance, while it was denied that any discrimination was intended, it was admitted that the defendants considered that the abattoir just outside the city line, and inspected thoroughly by Federal inspection before slaughtering, occupied a very different position from a packer who had his product shipped thousands of miles after it was inspected.   The twelfth section of the ordinance before us exceeds the authority of the municipality, undertakes to · deal with regulations of interstate commerce, is discriminatory in character, and void.

It was said in the bill of exceptions that the presiding judge, in refusing to grant the injunction prayed for, stated that he had very grave doubts as to the validity of the ordinance in question, and would resolve the doubt in favor of the defendants, and deny the injunction.   We appreciate his doubt, but can not resolve it in the same way as he did.   The ordinance, so far as here involved, is invalid, and the injunction should have been granted.   What has been said above renders a discussion of other grounds of attack on the ordinance and its administration unnecessary.

*Judgment reversed.   All the Justices concur.*