COCOA COLA BOTTLING COMPANY et al., Appellants, v. THOMAS SPEED MOSBY, State Beverage Inspector.

In Banc, July 22, 1921.

1. **CONSTITUTIONAL LAW: Deceptive Words.** A legislative act ·is not made an inspection law by the frequent use of the word inspection; mere words do not determine its character, but that is to be ascertained from the language employed, the legislative intention indicated by such language, and the object and purpose of the act considered as a whole.

2. ————: **Carbonated Waters: Grounds for Inspection.** The extensive manufacture and general use of carbonated waters, commonly known as "soft drinks," and other like preparations having no merit other than the creation of a pleasant but fleeting gustatory sensation, are the moving cause of legislation providing for their inspection.

3. ————: **Police Regulation: An Inherent Legislative Power.** The police power is inherent in the State as a sovereignty, and needs no organic grant for its exercise by appropriate legislation. It can always be used in the interest of the general welfare to restrain one man from so using his property as to injure another.

4. ————: ————: **Inspection Laws: Police Regulation.** Laws providing for the inspection of foods and drinks, if they relate to the purity of the article inspected and are designed to promote the public health by prohibiting the use of deleterious substances in their preparation, are the exercise of the police power. A prohibition may be placed by law upon the making and sale of any article deleterious to the user, and that may be accomplished by a reasonable inspection law.

5. ————: ————: **Inspection or Revenue Act: Provisions.** An act providing for the inspection of carbonated waters which defines the duties of an official who is charged with its execution, provides specifically for the products to be inspected, prohibits the manufacture and sale of such products as are not pure and wholesome, requires samples of such products to be submitted for inspection, requires labels showing the nature of the beverage and that it has been inspected as to character and purity to be placed upon all packages, prescribes a penalty for the misuse of the labels and for the failure of the inspector to perform his duties,

Cocoa Cola Bottling Co. v. Mosby.

prescribes the fees for inspection and directs that records of the inspection work shall be kept, is an inspection measure, whose purpose is to promote the public health, and, unless it can be shown that its operation is onerous and the result of its enforcement alien to the purpose of its enactment, will not be held to be a mere revenue measure, but a reasonable exercise of the police power.

6. ——: Title: Inspection Law. The title to an inspection law need not expressly show that it is not a revenue measure. Section 28 of Article 4 of the Constitution does not require that the title of an act shall particularize the items it contains or does not contain. It simply means that the title shall unmistakably indicate the contents of the act.

7. ——: Inspection: By Sample. Inspection of carbonated waters by sample, instead of the entire product, does not render the law invalid as a police regulation.

8. ——: ——: No Penalty for Manufacture. An inspection law which affixes a penalty to the sale of an article unless it has been inspected and labeled is not invalid because it prescribes no penalty for the manufacture of impure products. It is the sale of impure products that the law strikes at, for it is by their sale that injury to the public is made effective.

9. ——: ——: Excessive Fees: Revenue Measure. Inspection fees are not restricted to the mere expense of the inspection. It is impossible for the Legislature, in enacting an inspection law, to determine the exact expense of its execution or to nicely gauge the charge that should be required. What is a reasonable fee depends largely upon the sound discretion of the Legislature. An inspection law will not be held to be a revenue measure merely because in the first years of its operation the fees collected amount to more than three times the expenses; especially should this be the ruling where the Legislature, after discovering such excess, made very substantial reductions in the fees to be thereafter charged.

10. ——: ——: ——: Presumption of Legislative Reduction. An inspection law being otherwise valid and the amount of the fees to be charged being largely within·the sound discretion of the Legislature, the presumption is that the Legislature, upon discovering that the fees authorized to be charged and collected largely exceed the probable costs of inspection, will reduce the fees, and the courts do not interfere, immediately upon application, upon a showing that the fees collected for the first two years after the enactment of the law largely exceeded the expense.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,* Judge.

AFFIRMED.

*Phillips W. Moss* for appellants.

This act is a revenue measure, and as such violates the Constitution of Missouri as follows: (1) Section 20, Article IV, in that the fact that it is a revenue measure is not clearly stated in its title. (2) Section 3, Article X, in that the tax levied under the provision of said act is not uniform upon the same classes of subjects within the territorial limits of the State. (3) Section 4, Article X, in that all property in the State subject to the tax imposed is not taxed in proportion to its value. (4) Section 7, Article X, in that Section 9 of said act exempts beverages manufactured in this State and exported outside of the State for sale. (5) Section 8, Article X, in that it undertakes to tax property at a rate excessive of the rate therein established. City of Brookfield v. Touhey, 146 Mo. 719; State v. Stevens, 146 Mo. 662; State v. Bixman, 162 Mo. 1; State v. Bengsch, 170 Mo. 81; Welton v. State, 81 U. S. 275; State v. Spiegel, 75 Mo. 145; City v. Weitzel, 130 Mo. 600.

*Jesse W. Barrett,* Attorney-General, and *Merrill E. Otis,* Assistant Attorney-General, for respondent.

(1) The argument that the soft drinks inspection law of 1919 is unconstitutional is based on the contention that that law is not what it purports and declares itself to be, namely, an inspection measure, but that in reality it was intended to be and that it is a revenue measure, "masquerading under the guise of an inspection law." It is, however, an inspection measure and, therefore, within the constitutional power of the Legislature to enact. Inspection laws are a proper exercise of the police powers of the state and the cost thereof may legally be assessed against the owners and producers of the things inspected. (2) Courts will not

arrive at the conclusion that the Legislature has attempted to make the right to exact inspection fees a cover for imposing a tax for general revenue purposes until compelled to do so. Good faith and honesty on the part of the Legislature is presumed. Willis v. Standard Oil Co., 50 Minn. 290, l. c. 297; State ex rel. v. Ross, 166 Pac. 505. (3) What is a reasonable fee for inspection must depend largely upon the sound discretion of the Legislature, having reference to all the circumstances and necessities of the case, and unless it is manifestly unreasonable in view of the purpose of the law as a police regulation, the court will not adjudge it a tax. McLean v. D. & R. G. Railroad, 203 U. S. 38; Foote & Co. v. Maryland, 232 U. S. 494; Wadhams Oil Co. v. Tracy, 141 Wis. 150, 123 N. W. 785. (4) So long as an inspection fee is not so much in excess of what appears to be reasonably required for inspection as to make it appear to be an act designed for revenue instead of regulation, it presents no judicial question. 22 Cyc. 1365, note; State ex rel. v. Ross, 166 Pac. 505; People v. Harper, 91 Ill. 357; Willis v. Standard Oil Co., 50 Minn. 290, 52 N. W. 652; Territory v. D. & R. G. Railroad, 78 Pac. 74; Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 345. (5) If the amount of money raised by an inspection system proves to be larger than is required for the purpose, it is to be presumed that the Legislature will decrease the charge. In the instant case the Legislature reduced the charge at the first opportunity, after a tryout of the law. Patapsco Guano Co. v. North Carolina, 171 U. S. 345; Red C Oil Co. v. North Carolina, 222 U. S. 380. (6) Owing to the varying fluctuations of trade it is manifestly impossible for the Legislature to determine with exact nicety the amount of inspection charges required to carry its purposes into execution. Mere excess in net surplus revenues is of itself no warrant for disturbing the law nor would even a flagrant excess in a single year invalidate it. Castle v. Mason, 91 Ohio St. 296. (7) The dispropor-

289 Mo.—30

tion between the amount of fees collected under a statute purporting to be an inspection measure and the expenses incurred in its execution will justify a court in holding it to be invalid only when one of two conditions is met: Either the discrepancy must be so great that the court is forced to the conclusion that the Legislature in the first instance acted in bad faith, and intended to provide a revenue under the pretext of requiring an inspection, or else the Legislature must have neglected an opportunity to revise the charges exacted, after experience had shown those previously imposed to be excessive. State ex rel. v. Ross, 166 Pac. 505. (8) Appellants rely upon the dissenting opinion in State v. Bixman, 162 Mo. 41. Even that dissenting opinion, however, gives no support to the contention of appellants. The facts of that case and of the instant case are wholly dissimilar. Here we have a law that in the first seventeen months of its existence has produced three times the cost of administration, whereupon the Legislature, at the first opportunity, has reduced the rate, but in the Bixman case it was shown that the beer inspection law produced annually forty-five times the cost of inspection and there was no indication of legislative intention to reduce the rate. State v. Bixman, 162 Mo. 58. (9) That an inspection law may legally exempt from inspection fees goods exported from the State has been expressly upheld in this State. State v. Bixman, 162 Mo. 39.

WALKER, J.—This is a suit in equity, brought in the Circuit Court of Cole County, by certain incorporated companies engaged in the compounding and sale of what, in common parlance, are termed "soft drinks." The purpose of the action is to restrain the State Beverage Inspector from enforcing the provisions of an act approved April 25, 1919 (Laws 1919, p. 379), providing for the inspection of non-intoxicating carbonated beverages, and syrups, extracts and flavors used in the preparation

of same, requiring a monthly report of sales and the payment of fees by the manufacturers of those products, for inspection services and prescribing penalties for violations of the act. It is contended that the act is unconstitutional and hence void. Upon a hearing before the circuit court, there was a finding for the defendant, the injunction was denied, the petition dismissed, and an appeal perfected to this court.

Aside from the formal admission as to the corporate existence and the nature of the business of each of the plaintiffs, and the official character of the defendant, it was conceded, in an agreed statement of facts, that defendant had required plaintiffs to file monthly reports and pay fees upon their respective sales, based upon the rates fixed by said act; that during the period from April 25, 1919, to September 20, 1920, defendant had collected in fees from all sources under said act, $360,054.85, of which sum $90,318.01 was received from bottlers of soda water, and the remainder from manufacturers of other non-intoxicating beverages and from soda fountains. That the total expense of said defendant's office during the time stated was $98,084.51. That during said time, chemical and bacteriological analyses were made in the laboratory of said defendant, of samples of the beverages compounded by plaintiffs and others engaged in a like business; and, in addition, a personal inspection was made of the places where such beverages were manufactured or sold in this State, upon an average of about once per month; that the value of the products of these plaintiffs and the price at which they are sold is from thirty-six to eighty cents per gallon; that the value of the products of other manufacturers of like products is from twenty-eight cents to one dollar per gallon.

I.  The contention of the plaintiffs is that this act is a revenue, rather than an inspection measure, and consequently void, and that the word "inspection," wherever used therein, is but a subterfuge to conceal the

Inspection:
Police
Regulation.

real purpose, and free the act from the restrictions of the Constitution which, if applied to a revenue measure, would render it inoperative. Mere words will not, of course, suffice to determine the character of a legislative act; they are but milestones measuring the distance and marking the way to the goal of true meaning in all journeys of interpretation. Despite the frequency, therefore, of the use of any particular words in an act which, if properly used, are indicative of its character, its meaning and purpose are to be determined by an application of the tests recognized by the canons of construction. Among these tests of more than minor importance and perhaps sufficient within themselves to solve the question confronting us, may be mentioned the language employed, the intention of the Legislature as indicated by that language and the object and purpose of the act when construed as a whole. Novel preparations of both foods and drinks are constantly increasing in quantity and variety, often alluring in name, and uniformly, whether justly or not, emblazoned with the hallmark of merit by the ingenious advertiser; their distribution soon becomes wide-spread, their reputed merits familiar and their consumption general. Illustrative of this fact are the myriad forms of so called breakfast foods, the nomenclature of which has well-nigh exhausted human fancy, and whose health giving properties, measured by the modest claims of their makers, equal, if they do not excel, the magical effect of the waters of the padre's spring of San Joaquin, concerning the virtues of which Bret Harte charmingly invokes the aid of the Muse.

Another illustration more pertinent to the matter at issue is to be found in the carbonated waters and their concomitants now so extensively manufactured and generally used, that they no longer require the aid of printer's ink to promote their sale. Consisting simply of water charged with carbon dioxide to which is added an acid to create effervescence and flavored oftenest to simulate a fruit or herb whose parent stem was probably

the alembic of a laboratory, and making no claim to merit other than the creation of a pleasant, but fleeting gustatory sensation, the extensive manufacture and general use of preparations of this character are akin to the remarkable.  An English curate after having met Lord Chesterfield, was asked what he thought of him. He said he might be lacking in many virtues, but ''he certainly left a pleasant taste in one's mouth.'' This, at least may be said of what we familiarly call soda water and other soft drinks, which sparkling like the vintages of Champagne and Moselle, tickle the palate, but here the simile ceases. These observations, casually considered, might seem to indicate a wandering afield.  But not so. The fact that these and other preparations, especially those intended for food or drink, are so extensively made and so generally used, is the moving cause of legislation of the character here under review.  In short, it is but another illustration of the exercise of the police power, inherent in the State as a sovereignty, needing no organic grant for its existence and demanding legislative aid only to give it form and provide a procedure for its operation.  Many attempts have been made to define this power, the most comprehensive of which perhaps is that of Judge Cooley (q. v., Cooley's Con. Lim. (7 Ed.) p. 289).  It is not necessary to quote it here on account of its length.  It will answer our purpose to say that by means of this power the Legislature exercises supervision over matters involving the public welfare and enforces the observance by each individual, of the duties he owes to others and to the community at large.  The motto of this State that the will of the people is the supreme law, is one of the fundamental principles involved in the exercise of the police power.  Another upon which the power to a large extent rests is the maxim that you must so use your own as to not injure the rights of others.  It is said that nearly every problem involved in the exercise of the police power finds its solution in the application of the principle embodied in this maxim.  [6 R. C. L. p. 188, sec. 186; Sings v.

Joliet, 237 Ill. 300, 127 Am. St. 323, 22 L. R. A. (N. S.)
1128; Karasek v. Peier, 22 Wash. 419, 50 L. R. A. 345.]
That inspection laws are within the sphere of the State's
authority, in its exercise of the police power, is as clear
as the power of Congress to establish regulations of
commerce. [Foster v. New Orleans, 94 U. S. 245, 24
U. S. (Law Ed.) 122; Mayor of New York v. Miln, 11
Pet. 102, 9 U. S. (Law Ed.) 648; Armour & Co. v. Au-
gusta, 134 Ga. 178, 27 L. R. A. (N. S.) 676.]   This is
true because inspection, especially of foods or drinks,
concerns itself with the purity of the article inspected
and hence is promotive of health in prohibiting the use
of deleterious products.   In the restrictions which follow
the enforcement of inspection laws, we discern the appli-
cation of the maxim above referred to, viz., "*Sic utere
tuo*," etc, in that, regardless of the manner in which
you use your own, whether it be as an individual, or as
a manufacturer producing commercially an article for
sale, that use must be such as to not injure the user.   In
other words, a prohibition may be placed by law upon
the making and sale of any article deleterious to the
user, as in the case of impure articles of food or drink.
There remains, therefore, nothing upon which the con-
tention can rest that laws of the nature of that under
review, may not be enacted and enforced, subject, of
course, to such restrictions as the Constitution has placed
upon laws generally, as to reasonableness within which
is included all of the objections urged by the plaintiffs
against the validity of this enactment.

II.   Preliminary to the consideration of these con-
stitutional questions, let us examine the language of the
act to determine therefrom its character, viz., whether it
is to be classified as an inspection or a revenue measure.
Reasonable Law. It provides for and defines the duties of an
official who is charged with the execution of
its provisions; it prescribes specifically the
products to be inspected; it prohibits the manufacture
and sale of such products if not pure and wholesome;

it requires samples of such products to be submitted for inspection by manufacturers and requires sellers of products not manufactured in this State to file affidavits of the manufacturers with the inspector that he may determine the purity of the products; and requires the inspection of such products; it prescribes the fees for inspection; directs the keeping of records of the inspector's work, of the fees collected by him and how reported and accounted for. Labels showing the nature of the beverage and that it has been inspected as to its character and purity are required to be placed upon all packages of same—a penalty being prescribed for a violation of this duty. Beverages manufactured in this State, but to be shipped out of it and sold elsewhere are to be inspected free to the manufacturers. Certificates of inspection and labels are to be prepared and kept by the State Treasurer to be delivered and charged to the inspector who shall keep a record of and account for same to the Treasurer. A penalty is prescribed for the misuse of certificates and labels. Likewise a penalty is fixed for a failure by the inspector to perform his duties. Other provisions embody matters of procedure not necessary to be set forth here. From the foregoing epitome, the conclusion is inevitable that so far as the subject-matter is concerned, this act, if words are to be read with their usual meaning, can not be otherwise construed than as an inspection measure. Thus classified and defined, it follows as a necessary consequence that such was the intention of the Legislature in its enactment; and that the object and purpose of the acts, as we have indicated in discussing general legislation of this character, was the public good, in that it tends to prevent fraud in the making of the products, is promotive of their purity and hence helpful to health. As a result of this conclusion, unless it can be shown that the operation of the act is onerous and the result of its enforcement alien to the purpose of its enactment, it will stand the test of judicial interpretation. [Lawrence v. Monroe, 44 Kan. 607, 10 L. R. A. 520; Bradford v. Jones, 142 Ky. 820; Parker v. Griffith, 151

N. C. 600; State v. Fargo Bottling Works, 124 N. W. 387; State v. Danenberg, 151 N. C. 718; Sawyer v. Botti, 124 N. W. 787; Comm. v. Henry, 65 S. E. 570, 26 L. R. A. (N. S.) 883.]

III.   To these limitations let us give attention in the order in which they are urged by counsel for the plaintiffs.

Before considering other matters, there is one relating to the form of the act which merits attention. It is contended that the title of the act insufficiently indicates its character, or more concretely, that it should show *in haec verba* that it is not a revenue measure. Without more ado, let the title itself answer this objection. It declares it to be "an act providing for and relating to the inspection of all non-intoxicating and carbonated beverages and so-called soft drinks, by whatever name called, also syrups, extracts and flavors of all kinds intended for use in the preparation and concoction of soft drinks," etc. Read even cursorily, the merest tyro cannot mistake the meaning of these words. So clearly do they define the object of the act that an attempt to explain them ends only in redundancy and possible confusion.

*Title.*

The State Constitution (Sec. 28, Art. 4) is read to little purpose if it be held to require that the title of an act must present the particularity of an itemized account or the minutiae of a chemical analysis. When the Constitution provides, therefore, that "no bill  . . . . shall contain more than one subject which shall be clearly expressed in its title," it simply means that the title shall indicate in an unmistakable manner the general contents of the act; it does not require, nor was it intended that it should descend into particulars, but that it will be sufficient if it defines the nature of the statute and thus informs the reader as to its purpose. The nature of this constitutional provision being thus understood, the tendency of the Courts in numerous rulings has been to construe it liberally in aid of all well directed

legislative power. [State ex rel. v. Guinotte, 275 Mo. 298; Booth v. Scott, 205 S. W. (Mo.) 633; State ex rel. v. Roach, 258 Mo. 541; State ex rel. v. Drabelle, 258 Mo. 568; Burge v. Railroad, 244 Mo. 76; State v. Hanson, 234 Mo. 583.] There is no merit in this contention.

IV. The provision for the inspection of samples, intsead of the entire product, it is contended, constitutes a subterfuge which renders the act inutile as an exercise of the police power and consequently invalid. A like contention was made in the Bixman Case, 162 Mo. l. c. 34, in which the statute authorizing the inspection of beer was under review; in recognition of the beneficent purpose of the law and to further its object, the court construed it liberally and held that the inspector might take a sample at random from the various cases, or go directly to the brewery and take a sample of the mash from the vats in making his tests. The reason for this ruling is apparent. It accomplishes the purpose of the act with a minimum amount of trouble and expense to the owner of the product inspected. Any other course would prove tedious, expensive and impracticable. Inspection by sample is authorized and has been satisfactorily practised for many years in this State in the regulation of the sale of grain, milk and other food products. This course has received legislative authority and judicial recognition elsewhere and we fail to find any contention that it has not proved effective, or that it is counter to any constitutional provisions. [State v. Dupaquier, 46 La. Ann. 577, 26 L. R. A. 162; Comm. v. Carter, 132, Mass. 12.]

*Inspection of Samples.*

V. The validity of the act is assailed on the ground that no penalty is prescribed for the manufacture of impure, unclean and unwholesome products. This objection is purely finical. The purpose of the law is not to regulate the manufacture, but the sale of impure products. Lacking this

*Penalty for Manufacture.*

requisite, the validity of the act as an exercise of the police power might well be questioned. In what manner can the use of these products prove injurious, within the meaning of the maxim, "*Sic utere*," etc., unless they are dispensed or disposed of to others or, in a word, sold? As a condition precedent to their sale, it is required that they be inspected and for a failure to comply with this requirement the seller subjects himself to a penalty. So far, therefore, as the effectiveness of the act, or the furtherance of its purpose is concerned, it in no wise affects its validity that it contains a provision prohibiting the use of deleterious substances in the products included, but attaches no penalty to its violation.

VI.    Passing without considering other constitutional provisions relied upon by the plaintiffs as having been violated in the enactment of this act and which cease to be centers of contention unless this be a revenue measure, we come to the question of the amount of the fees for inspection as indicative of the character of the act. Waiving, as it were, all other grounds of attack, counsel contend that the gross amount of the fees collected for inspection is such as to fix beyond a peradventure the character of the act as a revenue measure. If the amount alone of the fees collected during the term stated, sufficed for this purpose, the contention might be conceded without further controversy. It does not, however. As we said in effect in the Bixman Case, supra: "Under no 'circumstances are inspection fees restricted to the mere expense of the act of inspection." It is the tendency and not improperly so, of legislature to require the subject inspected to bear the expense of same. If it happens, as is not infrequently the case, that the amount of the fees is in excess of the expense incurred in the performance of the services, this will not of itself destroy the character of the act as an inspection measure. Especially if it appears as it does here, that the Legislature, upon ascertain-

*Excessive Fees.*

ing the amount of the excess, reduced the fees as applied to future inspections. By an act adopted in 1921, the fee for the inspection of soft drinks was reduced from 1½ cents to three-fifths of one cent per gallon, and on syrups, flavors, etc., from ten cents to five cents per gallon. [Laws 1919, p. 381; Laws 1921, p. 402.] It is impossible for a legislature in the enactment of a law authorizing the collection of fees in its enforcement, to determine the exact expense of its operation and nicely gauge the measure of the charge which should be required. The courts cognizant of this difficulty hold that what is a reasonable fee must depend largely upon the sound discretion of the Legislature. If the fee fixed proves excessive, this will not of itself render the law invalid, as it will be presumed that the Legislature upon ascertaining the fact of the excess will remedy the defect.

A recent ruling of a court of last resort upon this subject will be found in State ex rel. Brewster v. Ross, 166 Pac. (Kan.) 505, in which it is shown that during the first two years of the operation of the statute, there under review, the fees collected for inspection were nearly four times the expenses incurred. The Supreme Court of Kansas, in the discussion and determination of this question, said: "The mere fact that the fees charged under such a statute exceed the expense of its execution is not enough to render it invalid. For instance, the difference between an income of from $70,-000 to $75,000, and an outlay of from $55,000 to $60,000, has been said by this court not to afford a sufficient basis for avoiding such a statute. [State ex rel. v. Railway Co., 87 Kan. 348, 365, 125 Pac. 98.] To have that effect one of two conditions must be met: Either the discrepancy must be so great that the court is forced to the conclusion that the Legislature in the first instance acted in bad faith and intended to produce a revenue under the pretext of requiring an inspection, or else the lawmaking body must have neglected an opportunity to revise the

charges exacted after experience had demonstrated beyond controversy that as previously imposed they were unreasonably and unnecessarily high. These principles are too well established to require extended discussion, but a brief reference will be made to the decisions on the subject. In a case involving the validity of a state law imposing a charge of twenty-five cents per ton upon fertilizers to cover the cost of inspection, interstate commerce being incidentally affected, it was said by the United States Supreme Court: 'Entertaining these views of the legislative intention, it does not appear to us that evidence tending to show that money collected from this source was applied to other than the purposes for which it was received should be entered into on this inquiry into the validity of the act. If the receipts are found to average largely more than enough to pay the expenses, the presumption would be that the Legislature would moderate the charge. But, treating the question whether the charge of twenty-five cents per ton was shown to be so excessive as to demonstrate a purpose other than that which the law declared, as a judicial question, we are satisfied that comparing the receipts from this charge with the necessary expenses, such as the cost of analyses, the salaries of inspectors, the cost of tags, express charges, miscellaneous expenses of the department in this connection, and so on, we cannot conclude that the charge is so seriously in excess of what is necessary for the objects designed to be effected, as to justify the inputation of bad faith and change the character of the act.' [Patapsco Guano Co. v. Bd. of Agriculture, 171 U. S. 345, l. c. 354, 18 Sup. Ct. 862, 865, 43 L. Ed. 191.]''

Expressions of other courts of last resort are to the same general effect, as follows: ''The law being otherwise valid, the amount of the inspection fee is not a judicial question; it rests with the Legislature to fix the amount, and it can only present a valid objection when it is shown that it is so unreasonable and disproportion-

ate to the services rendered as to attack the good faith of the law.'' [McLean v. Denver & Rio Grande R. R. Co., 203 U. S. 1. c. 55, 27 Sup. Ct. 1. c. 5, 51 L. Ed. 78.]

''If the trial made of the act establishes the facts to be as asserted, that the exaction in question is excessive, the presumption is that, in the orderly conduct of the public business of the State, the necessary correction will be made to cause the act to conform to the authority possessed, which is to impose a fee solely to recompense the State for the expenses properly incurred in enforcing the authorized inspection.'' [Oil Co. v. Bd. of Agriculture, 222 U. S. 380, 32 Sup. Ct. 152, 56 L. Ed. 240.]

''Inspection necessarily involves expense and the power to fix the fee, to cover that expense, is left primarily to the Legislature which must exercise discretion in determining the amount to be charged, since it is impossible to tell exactly how much will be realized under the future operations of any law. Besides, receipts and disbursements may so vary from time to time that the surplus of one year may be needed to supply the deficiency of another. If, therefore, the fee exceed cost by a sum not unreasonable, no question can arise as to the validity of the tax so far as the amount of the charge is concerned. And even if it appears that the sum collected is beyond what is needed for inspection expenses, the courts do not interfere, immediately on application, because of the presumption that the Legislature will reduce the fees to a proper sum.'' [Foote & Co. v. Stanley, 232 U. S. 949, 34 Sup. Ct. 377, 57 L. Ed. 698.]

''It is not necessary that the Legislature determine with exact nicety the amount of the inspection charges required to carry its purpose into execution. This is manifestly impossible owing to the varying fluctuations of trade. Mere excess in net surplus revenues is of itself no warrant in disturbing the law, nor would we feel disposed to hold that a flagrant excess in a single year over the expenses would invalidate it. What we do hold is, that under the facts disclosed here, where it appears

that the fees are not only excessive, but are being continued, yielding each and every year increasing net revenues, the natural operative effect of the inspection act thus shown is in direct violation of Article 1, Section 10, of the United States Constitution, and consequently void." [Castle v. Mason, 91 Ohio St. 296, 110 N. E. 463, Ann. Cas. 1917A, 164.]

As we have shown, the objections urged to the law as considered by the Supreme Court of Ohio, in the Castle-Mason case, are met by the amendment in 1921 of the act here under review.

If the Legislature of this State had not enacted the amendment of 1921, supra, and in all other respects the act had possessed, as we have shown it does, the form and features of an inspection measure, this would not authorize a holding as to its invalidity, because of the presumption that the Legislature will reduce the fees upon acquiring a knowledge of their excess, to a sum more nearly necessary to the expenses of inspection. [State v. Standard Oil Co., 161 N. W. (Neb.) 537, L. R. A. 1917D, 746; State v. Bartles Oil Co., 132 Minn. 138, L. R. A. 1916D, 193; Lee Co. v. Webster, 190 Fed. 353.]

While we have examined the other objections urged by counsel for plaintiffs, we have not deemed it necessary to formally discuss them in view of our expressed conclusion as to the validity of the act.

The judgment of the trial court is, therefore, affirmed. All concur.